# In the United States Court of Federal Claims

No. 25-695
(Filed: 20 November 2025)[*]

```
*****************************************
ADVANCED MANAGEMENT,            *
STRATEGIES GROUP, INC.,         *
                                *
            Plaintiff,          *
                                *
v.                              *
                                *
THE UNITED STATES,              *
                                *
            Defendant,          *
                                *
and                             *
                                *
HARKCON, INC.,                  *
                                *
            Defendant-Intervenor. *
                                *
*****************************************
```

*Craig A. Holman*, Arnold & Porter Kaye Scholer, LLP, with whom was *Thomas A. Pettit*, of Washington, D.C. for plaintiff.

*Steven M. Mager*, Acting Assistant Director, Commercial Litigation Branch, Civil Division, with whom were *Patricia M. McCarthy*, Director, *Yaakov M. Roth*, Acting Assistant Attorney General, *Joshua W. Moore*, Trial Attorney, U.S. Department of Justice, and *William Mayers*, Attorney, Office of the General Counsel, National Nuclear Security Administration, U.S. Department of Energy.

*Thomas K. David, Esq.*, Reston Law Group, LLP, with whom were *Kenneth D. Brody* and *Lewis P. Rodes* of Reston, VA, for defendant-intervenor Harkcon Incorporated.

## OPINION AND ORDER

**HOLTE**, Judge.

---

[*] This Opinion was originally filed under seal on 2 November 2025 pursuant to the protective order in this case. The Court provided the parties an opportunity to review this Opinion for any proprietary, confidential, or other protected information and submit proposed redactions by 10 November 2025 at 5:00 p.m. The Court granted an extension of time to 17 November 2025 at 5:00 p.m. *See* Order Granting Consent Motion for Extension of Time, ECF No. 46. The Court accepts the parties' proposed redactions and reissues the Opinion with minor formatting edits and the redacted language removed and/or replaced as follows: "[XXXXX]."

The U.S. Department of Energy, National Nuclear Security Administration issued a Request for Quotation on a contract to provide support services for the safe transportation of spent nuclear material. Plaintiff Advanced Management Strategies Group, Inc. brings this action against defendant the National Nuclear Security Administration seeking: (1) a declaration the National Nuclear Security Administration's evaluation of defendant-intervenor Harkcon, Inc.'s quotation, best value determination, and failure to exclude from the competition was arbitrary, capricious, or contrary to law; (2) a permanent injunction precluding the NNSA from awarding the contract to Harkcon, directing them instead to award it to plaintiff; and (3) leave to conduct discovery and supplement the administrative record. For the following reasons, the Court denies plaintiff's Motion for Leave to Conduct Limited Discovery and to Supplement the Administrative Record, grants the government's and intervenor's Cross-Motions for Judgment on the Administrative Record, and denies plaintiff's Motion for Judgment on the Administrative Record.

## I.    Factual Background

### A.    Request for Quotation

On 4 September 2024, the U.S. Department of Energy, National Nuclear Security Administration ("DOE," "NNSA," or "the Agency") issued a Request for Quotation ("RFQ") as a Service-Disabled Veteran-Owned Small Business ("SDVOSB") set-aside under the Technical, Engineering, and Programmatic Support Services III ("TEPS III") Blanket Purchase Agreement ("BPA"), seeking a contractor "to provide Administrative Support Services for [the Office of Secure Transportation ('OST')]." Admin. R. ("AR") Tab 10a at 238 (Project Work Statement ("PWS")). The solicitation was for "the administration related to the safe transportation of nuclear material." 17 September 2025 Oral Argument Transcript ("Tr.") at 7:12–14, ECF No. 42. The Agency amended the RFQ twice. *See generally* AR Tab 10 (RFQ Amendment 1); AR Tab 11 (RFQ Amendment 2). Amendment 1 contains the final version of the PWS and the final instructions and evaluation criteria. *See* AR Tab 10a (PWS); AR Tab 10c (Solicitation Instructions). Amendment 2, which focuses solely on a narrow foreign ownership, control, and influence issue, is not relevant to this case. *See generally* AR Tab 11 (RFQ Amendment 2).

The PWS sought a contractor "to provide Administrative Support Services for OST." AR Tab 10a at 328 (PWS). The services included "management and administrative support," "project and budget analysis, document controls, federal payroll data entry, travel vouchers processing, technical editing/writing, purchase requests processing, and invoice tracking." *Id.* As part of the services, the contractor must make "recommendations for managing, monitoring, and tracking the completion of critical projects, programs and data calls, strategic and operational programs, budget development and evaluation and implementation of Government performance metrics and measures." *Id.* RFQ Amendment 1 incorporates Q&A exchanges with the offerors. *See generally* AR Tab 10d (Solicitation Q&A). One offeror asked: "Given that there is an incumbent, would the government consider inserting a transition requirement to the PWS?" AR Tab 10d at 388 (Solicitation Q&A). The Agency responded: "No, due to the administrative nature of this requirement, the Government views the transition risk-level as low; therefore, [the contract] will not have a transition period for this requirement." *Id.*

The RFQ requires the Agency to award the order to the TEPS III BPA "Schedule holder whose quote represents the best value to the Government on the basis of the evaluation factors," namely (1) Technical Narrative/Approach; (2) Staffing Approach; (3) Key Personnel Resume; (4) Past Performance; and (5) Price. AR Tab 10c at 377–78 (Solicitation Instructions). The factors are listed in descending order of importance: the first four ("non-price factors") are more important than price, and if any of the first three factors are found less than "Satisfactory," this "will result in elimination of the quote from further consideration regardless of the ratings of the other factors." AR Tab 10c at 383 (Solicitation Instructions).

For Factor 1, "Technical Narrative/Approach," the RFQ states "[t]he Vendor shall describe its proposed technical approach and ability to successfully perform the PWS Section 3.0—Specific Tasks/Technical Requirements" and "shall describe its process/steps for completing the technical requirements to include citing relevant experience where similar activities were performed." AR Tab 10c at 378 (Solicitation Instructions). The Agency must "evaluate the Technical Narrative/Approach to determine the extent to which it demonstrates the Vendor's understanding of, and ability to successfully perform the Specific Tasks and Technical Requirements outlined in Section 3 of the PWS (Attachment 1)." *Id.*

For Factor 2, "Staffing Approach," the RFQ states "[t]he Vendor shall describe its proposed staffing approach and detail its approach for on-boarding of the minimum number of cleared staff on Day 1." *Id.* Secondly, "the Vendor shall propose a Task/Labor Mix with rationale on why the Vendor believes the number of proposed personnel is sufficient to accomplish the PWS requirements outlined in Section 3 of the PWS (Attachment 1), including discussions on why it believes that variations in the Labor Categories specified in PWS Enclosure 4, Labor Category Descriptions (Attachment 1) will result in successful accomplishment of the PWS requirements." *Id.*

For Factor 3, "Key Personnel Resume," the RFQ states:

> **Key Personnel Resume (3-page limit)** – The Vendor shall provide a resume for the proposed key personnel, Program Manager, in accordance with Attachment 1, PWS Section 1.5.12, Key Personnel and Attachment 1 PWS Enclosure 4, Labor Category Descriptions, Section A, Key Personnel.
>
> Vendor must provide the following information on the Key Personnel Resume:
> • Name of Key Person.
> • Chronological Work History: Start with current position and work backwards.
>   A. Name and Address of Firm:
>   B. Position(s) Held:
>   C. Dates of Employment:
>   D. General Summary of Responsibilities: Provide a concise description of major duties and responsibilities for each job relevant to the proposed position. Address specific experience as it relates to managing a programs, projects, contracts, funds, staffing, customer interface, or resources of similar size, scope, and complexity.

• Education: Provide degree(s) attained; discipline(s); year(s) degree(s) attained; and institution(s).
• Level of Security Clearance (if any).

AR Tab 10c at 379 (Solicitation Instructions).  Under the RFQ, the Agency must "evaluate Key Personnel (onsite) Resume to determine the extent to which the proposed individual's education, work experience, and security clearance level demonstrates whether the individual has the expertise and ability to successfully perform his or her role in executing the relevant PWS task(s)."  *Id.*

In evaluating Factors 1, 2, and 3, the RFQ requires the Agency to "assign one of the following adjectival ratings for the Vendor's quotation":

| FACTORS 1, 2, AND 3 | |
|---|---|
| **RATING** | **DESCRIPTION** |
| Exceptional | The Vendor demonstrated a thorough understanding of, and ability to perform, the PWS requirements, as demonstrated by strengths that outweigh any weaknesses.  No deficiencies exist.  There is a very high probability of successful performance with no anticipated risk. |
| Good | The Vendor demonstrated an above average understanding of, and ability to perform, the PWS requirements, as demonstrated by strengths that outweigh any weaknesses or deficiencies.  There is a high probability of successful performance with a low degree of risk. |
| Satisfactory | The Vendor demonstrated an adequate understanding of, and ability to perform, the PWS requirements, as demonstrated by strengths and weaknesses that are generally offsetting or will have limited impact on performance.  While successful performance is anticipated, there may be a moderate degree of risk. |
| Marginal | The Vendor did not demonstrate an adequate understanding of, and ability to perform, the PWS requirements.  The quotation has one or more weaknesses or deficiencies which are not offset by strengths.  Risk of unsuccessful performance is high. |
| Unsatisfactory | Quotation does not meet requirements and/or contains one or more deficiencies.  Quotation is unawardable. |

AR Tab 10c at 379–80 (Solicitation Instructions).

For Factor 5, "Price," the RFQ states the Agency "will analyze the proposed CLIN and annual pricing for balance and may reject an offer if the Contracting Officer determines that the lack of balance poses an unacceptable risk to the Government."  AR Tab 10c at 383 (Solicitation Instructions).

As criteria for award, the RFQ states:

Vendors must, at a minimum, Satisfactorily address Factors 1, 2, and 3 to receive an overall determination of technical acceptability.  Only Vendors who receive an

overall technical acceptability determination and a "Pass" rating for Factor 4, Past Performance, will move forward for price quote evaluation. One Evaluation Team Member will serve as the lead and prepare a Technical Evaluation Report containing the summary findings. A rating of less than Satisfactory in one evaluation Factor (Factors 1, 2, or 3) will result in elimination of the quote from further consideration regardless of the ratings of the other factors. An unrealistic response in terms of technical or price will not be considered for award. The Government reserves the right to reject any quote that includes any exceptions, deviations, or conditional assumptions that impacts or affects the Government's requirements.

. . .

After quotes have been evaluated, the Order will be placed with the TEPS III BPA holder that represents the best value to the Government, based on the Government's evaluation of five (5) Factors (in descending order of importance): Factor 1: Technical Narrative/Approach; Factor 2: Staffing Approach; Factor 3: Key Personnel Resume; Factor 4: Past Performance; and Factor 5: Price.

The non-price factors, Factor 1, 2, 3, and 4, when combined, are significantly more important than price, as the Government is more concerned with obtaining a superior technical quotation than making award at the lowest price. However, the Government will not make an award at a price premium it considers disproportionate to the benefits associated with the evaluated non-price superiority of one Vendor over another. To the extent that the Vendors' non-price factors are evaluated as close or similar in merit, price is more likely to be the determining factor.

AR Tab 10c at 383–84 (Solicitation Instructions).

## B.      Award and GAO Protest

Four offerors submitted quotations in response to the RFQ, including AMSG and Harkcon. *See* AR Tab 30 at 1154–55 (Basis of Award). The Agency assigned the four offerors the following ratings:

| Vendor | Factor 1: Technical Narrative/ Approach | Factor 2: Staffing Approach | Factor 3: Key Personnel Resume | Factor 4: Past Performance | Factor 5: Price |
|---|---|---|---|---|---|
| Advanced Management Strategies Group, Inc. | Exceptional | Exceptional | Exceptional | Pass | $11,746,269.00 |
| ANALYGENCE, Inc. | Good | Marginal | Good | Pass | $9,587,458.00 |
| Harkcon, Inc. | Exceptional | Exceptional | Exceptional | Pass | $10,498,864.00 |

| Salmon Group, Inc. | Unsatisfactory | Unsatisfactory | Good | Pass | $6,944,281.00 |

*Id.* at 1161–62.

Based on those ratings, the Agency concluded "only Harkcon and [AMSG] were deemed 'Technically Acceptable' and advanced for final consideration." *Id.* at 1168–69; Tr. at 8:12–14 ("THE COURT: "[T]here were four bids, but the agency only treated AMSG and Harkcon as technically acceptable?" [THE GOVERNMENT]: That's correct."). The Agency concluded AMSG and Harkcon were technically equivalent, stating:

> Harkcon rated equivalent to AMSG for all Factors. Ultimately, the decision was made based on a best-value determination, with price serving as the decisive factor due to identical ratings for the two Vendors on all non-price factors.

> Harkcon's quotation offered the best value to the government, providing the required services at a $1,247,405.00, or 11.9%, lower price than AMSG while ensuring the same very high probability of successful performance. While Harkcon's and AMSG's quotations each had unique attributes under the non-price factors, none of the unique attributes or strengths of AMSG's proposal (individually, or combined) would justify an additional 11.9% price premium.

AR Tab 30 at 1169 (Basis of Award).

On 21 January 2025, AMSG timely filed a protest at GAO challenging the Agency's decision to award the task order to Harkcon. *See generally* AR Tab 39 (Post-Award Protest of AMSG). This protest was denied. *See generally* AR Tab 62 (GAO Public Decision).

## II.    Procedural History

On 23 April 2025, AMSG filed its sealed post-award bid protest challenging the Agency's award of the contract to Harkcon. *See* Compl., ECF No. 1. On 24 April 2025, defendant-intervenor Harkcon, Inc. ("Harkcon") filed an unopposed motion to intervene as a defendant, *see* Def.-Int.'s Unopp. Mot. to Intervene, ECF No. 6, which the Court granted the following day, *see* 25 April 2025 Order, ECF No. 8. On 30 April 2025, the Court held an initial status conference with the parties, and on 1 May 2025, the Court set a briefing schedule for cross-motions for judgment on the administrative record ("MJAR"). *See* 1 May 2025 Scheduling Order, ECF No. 15. Also on 1 May 2025, in a Joint Status Report ("JSR"), the government "agreed to stay performance of defendant-intervenor Harkcon, Inc.'s . . . contract at issue through November 16, 2025" to "obviate the need to litigate a motion for preliminary injunctive relief" and "provide the Court with sufficient time to issue a decision after full briefing." 1 May 2025 JSR at 1–2, ECF No. 14. Plaintiff also indicated its intent to move for leave to conduct limited discovery and to supplement the administrative record with the results of discovery—briefing related to such a motion was incorporated into the briefing schedule. *Id.* at 2. During its protest at the GAO, plaintiff submitted the declaration of one of its employees to support its claims, which the government included in the AR. *See* AR Tab 39a at 1720–21 (Declaration of [XXXXXXXX]). Harkcon indicated at the status conference it would submit its

own declaration to rebut plaintiff's allegations, but Harkcon never submitted a declaration. *See generally* 30 April 2025 Status Conference. On 23 May 2025, plaintiff filed its MJAR and its Motion to Conduct Limited Discovery and to Supplement the AR. *See* Pl.'s Mot. for Disc., ECF No. 22; Pl.'s MJAR, ECF No. 23.

The government and Harkcon filed their respective cross-MJARs and responses to plaintiff's motions on 6 June 2025. *See* Gov't's Resp. to Mots. for Supp. and Discovery, ECF No. 27; Gov't's Cross-MJAR, ECF No. 28; Def.-Int.'s Cross-MJAR and Resps. to MJAR, Mot. for Disc., and Mot. to Supp., ECF No. 26. On 16 June 2025, plaintiff filed its Response in opposition to the Cross-MJARs and its Replies supporting its own motions. *See* Pl.'s Reply to Resps. to Mots. for Discovery and to Supp., ECF No. 30; Pl.'s Resp. to Cross-MJARs, ECF No. 31. On 23 June 2025 and 26 June 2025, Harkcon and the government filed their respective replies in support of their cross-MJARs. *See* Def.-Int.'s Reply in support of Def.-Int.'s Cross-MJAR, ECF No. 33; Gov't's Reply in support of Gov't's Cross-MJAR, ECF No. 34. The Court held oral argument in Washington, DC on 17 September 2025. *See* 20 August 2025 Order Setting Oral Argument, ECF No. 39; *see also* Tr.

## III.   Parties' Arguments Regarding Plaintiff's Motion for Leave to Conduct Limited Discovery and to Supplement the Administrative Record

Plaintiff requests "limited discovery" to depose Mr. [XXX] and Ms. [XXX]—Harkcon's Chief Human Capital Officer—concerning [XXX]'s roles at Harkcon and Harkcon's efforts to recruit another program manager. Pl.'s Mot. for Disc. at 8–9. In addition, plaintiff requests "targeted document requests to Harkcon seeking [documents] relating to Harkcon's loss of its intended Program Manager, Harkcon's decision to propose Mr. [XXX] as the Program Manager, Mr. [XXX]'s intention to fill the position on-site during Contract performance, [and] Harkcon's plans [and efforts for] filling the Program Manager position." *Id.* at 9. Plaintiff argues it is proper for "the Court [to] supplement the record with (i) materials not before the agency but relevant to the decision at issue (even documents that post-date challenged decisions), or (ii) with discovery where it is necessary for the Court to gain a complete understanding of the issues before it." *Id.* at 6 (citations omitted). Plaintiff claims discovery is permitted where the "record [is] insufficient . . . when it is missing relevant information that by its very nature would not be found in an agency record—such as evidence of bad faith, information relied upon but omitted from the paper record, or the content of conversations." *Id.* (citations omitted). Finally, plaintiff argues this is an "uncommon case where substantial evidence exists in the administrative record for the Court to find that Harkcon made a material misrepresentation," but "even if the Court determines that this evidence alone does not require a material misrepresentation finding . . . discovery remains essential." *Id.* at 10.

The government responds plaintiff "is not claiming that the record before the agency lacks sufficient evidence to determine whether a misrepresentation has occurred" and "concedes that effective judicial review is possible on the record in front of the Court." Gov't's Resp. to Pl.'s Mot. for Disc. at 9 (emphasis omitted) (citing Pl.'s Mot. for Disc. at 10; Pl.'s MJAR at 17). The government argues the Court "should refuse to supplement the record, to permit further discovery, or to otherwise add to the record evidence, not previously possessed by the agency merely because the proponent of such measures believes that it will improve the court's

understanding of a case." *Id*. at 10–11. The government further argues [XXXXXXX]'s declaration "that Mr. [XXX], indicated to Ms. [XXX] in a phone call that he does not intend to serve as the Program Manager" should "not change the Court's analysis," because it "was not part of the record in front of the agency at the time," and "this Court should limit judicial review to the record actually before the agency." *Id*. at 14–15 (cleaned up). In the alternative, the government argues "even if the Court were to consider Ms. [XXX]'s declaration, it does not support AMSG's motion for discovery and supplementation," as "the declaration is directly contradicted by record evidence that was before the agency at time it made its decision." *Id.* at 15 (emphasis omitted). Finally, the government contends plaintiff's "requests to depose both Mr. [XXX] (the proposed PM) and Ms. [XXX] (Harkcon's chief human capital officer)" are "incredibly broad in scope . . . [and] unlikely to lead to discoverable information that would shed definitive light on [plaintiff]'s misrepresentation claim . . . [instead] serv[ing] to elucidate the mindset of Mr. [XXX] or Ms. [XXX], which goes to Harkcon's intent, rather than the fact that Harkcon made a misrepresentation [and] Harkcon's intent is not relevant here." *Id*. at 17.

## IV.    Parties' MJAR Arguments

The Court next reviews the arguments raised in the parties' Cross-MJARs.

### A.    Plaintiff's Argument Harkcon's Proposal Included a Material Misrepresentation

Plaintiff argues the Agency's evaluation of Harkcon was arbitrary and capricious because "Harkcon's quotation contains material misrepresentations and contravenes the RFQ key personnel requirements." *See* Pl.'s MJAR at 14. Plaintiff argues "[a]n offer that fails to comply with a material solicitation requirement is ineligible for award." *Id*. (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996)). Key personnel requirements, plaintiff continues, are material, when "noncompliance with key personnel requirements renders a proposal ineligible for award." *Id*. at 15 (citing *Plan. Rsch. Corp. v. United States*, 971 F.2d 736, 741 (Fed. Cir. 1992)). Plaintiff argues "[n]oncompliance with Program Manager requirements requires the Agency to assign an unsatisfactory rating, meaning the '[q]uotation is unawardable.'" *Id*. (quoting AR Tab 10c at 380 (Solicitation Instructions)). Plaintiff asserts Harkcon failed to meet the key personnel requirements because "Harkcon proposed [XXXXXX] as its Program manager and as a full-time, on-site (New Mexico) resource" without ever intending to place [XXX] as the program manager. *Id*. at 14. Plaintiff argues this is a material misrepresentation which requires the Court to disqualify Harkcon. *Id*.

The government responds "[a]t most, [plaintiff] has shown that Harkcon was contemplating a substitution of its PM after contract award, which is specifically allowed under the solicitation terms with CO approval," and "whether [Harkcon] does in fact replace Mr. [XXX] as the PM is a matter of contract administration, which is not subject to this Court's bid protest jurisdiction." Gov't Cross-MJAR at 22 (citations omitted).

Plaintiff then argues, "[e]ven assuming Harkcon did not materially misrepresent Mr. [XXX]'s availability to serve as the full-time program Manager, Harkcon's quotation remains ineligible for award because Mr. [XXX] lacks a DOE L security clearance." Pl.'s MJAR at 22.

According to plaintiff, the PWS "requires the Program Manager to have a DOE L security clearance 'on day one of the contract,'" and, while Mr. [XXX] did have a Top Secret ("TS") and former DOE Q clearance, plaintiff alleges he did not have the DOE L clearance at the time of the bid. *Id*. (quoting AR Tab 10a at 359, 361 (PWS)).

The government responds "[t]he agency reasonably found that Mr. [XXX]'s active TS clearance meets the requirements of RFQ Attachment 4 Factor 3: Key Personnel Resume Instruction." Gov't Cross-MJAR at 23. The government asserts "the RFQ did not require the PM to have a specific DOE clearance prior to the task order award," and "[t]he PWS states that the contractor employees must be able to obtain at a 'L' clearance within a reasonable time." Gov't Cross-MJAR at 22 (quoting AR Tab 10a at 330 (PWS)). The government argues "[t]he requirement is that the PM must have an L clearance on the first day of the task order performance," not at submission of a quotation, and "the solicitation instructed vendors to provide a resume for the vendor's proposed PM and required 'Level of Security Clearance (if any).'" *Id*. at 22 (citing AR Tab 10a at 359 (PWS); AR Tab 10c at 379 (Solicitation Instructions)) (emphasis omitted). Harkcon adds "[t]he DoD and the DOE have a well-defined reciprocity program for security clearances that allows individuals who hold DoD clearances to promptly obtain commensurate DOE clearances," and "when the current stay of performance against Harkcon is hopefully lifted at the conclusion of this protest, Mr. [XXX]'s DoD Top Secret clearance will be quickly processed under the Agency's reciprocity program and a DOE L level clearance will be issued prior to 'the first day of task order performance' as required by the RFQ." Def.-Int.'s Cross-MJAR at 4 (citations omitted).

## B. Plaintiff's Argument Harkcon Deviated from the Solicitation Requirement to Provide an Alternate When the Program Manager is Absent

Plaintiff argues Harkcon "took exception" to and deviated from the PWS requirement which says: "[t]he name of [the Program Manager] and an alternate who shall act for the Contractor when the manager is absent shall be designated in writing to the CO [Contracting Officer]." Pl.'s MJAR at 23 (quoting AR Tab 10a at 331 (PWS)) (alterations in original and emphasis omitted). Plaintiff alleges Harkcon's proposal providing their program manager as "the singular touch point for all facets of work performed on the contract" means Harkcon envisioned a program manager with no alternate and was intentionally deviating from the terms of the PWS. *Id*. at 23 (quoting AR Tab 13b at 613 (Harkcon Technical and Management Information)). Plaintiff argues "Harkcon's failure to identify an alternate . . . rendered Harkcon's proposal ineligible for award," and "[i]f the Agency properly evaluated the Harkcon quotation, the Agency would have excluded" it. *See id*. at 24–25.

The government responds plaintiff "reads into the solicitation terms that are not there." Gov't Cross-MJAR at 23. The government asserts "[t]he Solicitation does not require an alternate Program Manager be identified in the quotation[:] . . . [t]he requirement to identify an alternate is found in the Performance Work Statement," which is "a task order administration requirement," whereas "RFQ Factor 3 . . . does not require alternate Key Personnel be provided for the purpose of evaluation." *Id*. at 23–24. The government argues, because the "requirement to identify an alternate is . . . a matter of task order administration," this issue is "not subject to this Court's jurisdiction." *Id*. at 24.

**C. Plaintiff's Argument the Agency's Evaluation Under Factors One and Two Were Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Contrary to Law**

Plaintiff argues Harkcon should have failed under Factor 1, Technical Approach/Narrative and Factor 2, Staffing Approach, as Harkcon "took exception to the RFQ's express prohibition on a transition period." Pl.'s MJAR at 25. Plaintiff alleges "[t]he RFQ Amendment 1 incorporates the Q&A with offerors into the RFQ," including in relevant part: "[Q:] Given that there is an incumbent, would the government consider inserting a transition requirement to the PWS? [A:] No, due to the administrative nature of this requirement, the Government views the transition risk-level as low; therefore, [the task order] will not have a transition period for this requirement. *Id.* at 26 (quoting AR Tab 10d at 388 (Solicitation Q&A)) (alterations in original and emphasis omitted). Despite this, plaintiff alleges, while Harkcon acknowledged the prohibition by stating, "[w]e recognize and acknowledge that there is no transition period for this contract," Harkcon rejected the prohibition by stating "however, based on transitioning similar contracts in the past, we know there will be a period of ramp up/transition of the current staff." *Id.* (quoting AR Tab 13b at 628–29 (Harkcon Technical and Management Information)) (emphasis omitted). Plaintiff claims "Harkcon stated for 'Phase 4: Transition Complete' that '[o]nce all previous phases are successfully implemented, contract maintenance begins,'" which plaintiff argues shows "Harkcon will not begin performance immediately upon the contract start date as required." *Id.* at 27 (quoting AR Tab 13b at 629 (Harkcon Technical and Management Information) (emphasis omitted and alterations in original).

The government responds "[t]he agency did not advise offerors that there would be no transition activities," but instead "simply responded that there would be no formal transition period due to the administrative nature of the requirement." Gov't's Cross-MJAR at 25 (emphasis omitted). The government argues transition activities, defined as "either a pre-period of performance time between contract execution and the first day of performance, or . . . a period where both contracts will have overlap to provide a transition," is necessary as "a . . . solicitation [which] forbade any transition activities would make the solicitation patently defective because only the incumbent would be able to perform on day one." *Id.* at 24–25. The government affirms Harkcon proposed "transition activities, . . . acknowledg[ing] there is no task order transition period," but merely "presented a detailed plan for contract performance on the first day of the contract." *Id.* at 25 (emphasis omitted). The government argues the "agency reasonabl[y] understood Harkcon to be proposing to engage in transition activities while at the same time performing on the contract" because "Harkcon's 'Contract Start Process' does not rely on an assumption of a formal contract transition period." *Id.* at 26.

**D. Plaintiff's Argument the Agency's Best Value Tradeoff was Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Contrary to Law**

Plaintiff further argues the "Agency's best value decision was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law." Pl.'s MJAR at 30. First, plaintiff argues "the foregoing errors necessarily render the Agency's conclusion arbitrary [and]

capricious . . . because an award decision cannot rest on a materially flawed evaluation." *Id.* (citations omitted). Second, plaintiff argues the Source Selection Authority ("SSA") failed to "look behind adjectival ratings and compare the substantive differences between proposals," instead "reduc[ing] the competition to price." *Id.* at 31. Plaintiff points out "[t]he SSA observed that '[u]ltimately, the decision was made based on a best-value determination with price serving as the decisive factor due to identical ratings for the two Vendors on all non-price factors,'" despite plaintiff having "received twenty-one strengths . . . compared to Harkcon's fifteen strengths." *Id.* (quoting AR Tab 30 at 1169 (Basis of Award)) (some alterations in original) (other citations omitted). Third, plaintiff argues "the Agency overemphasized Harkcon's experience and minimized [plaintiff]'s experience, . . . highlight[ing] Harkcon's experience without any discussion about the substance of that experience or its relevance to this contract," while ignoring plaintiff's "exceptional incumbent experience despite the evaluators assigning [plaintiff] multiple strengths for its experience." *Id.* at 32 (citing Tab 27 at AR 1131) (other citations omitted).

The government responds "[w]hen a contract that is the subject of a bid protest was awarded based upon best value, the agency has even greater discretion than if the contract were awarded upon the basis of cost alone." Gov't Cross-MJAR at 29 (citations omitted). The government contends the Source Selection Official ("SSO"), "[a]fter reviewing the strengths of each quotation," determined "AMSG and Harkcon presented 'the same very high probability of successful performance,' . . . [and so] turned to price as the decisive factor and found that Harkcon's quotation, which was $1,245,405 lower in price, offered the best value." *Id.* at 30 (citing AR Tab 30 at 1169 (Basis of Award)) (other citations omitted). The government contends "the SSO, in making her award decision, 'examined the relevant data and articulated a "rational connection between the facts found and the choice made."'" *Id.* at 30 (citations omitted). The government argues the SSO's decision was rational because "the SSO concurred in and independently adopted the [Technical Evaluation Panel's ("TEP")] assessment of the strengths within each quotation, . . . [and] provided a thorough review of the advantages that she identified in each quotation." *Id.* (citations omitted).

### E.    Plaintiff's Argument Harkcon is Ineligible to Compete for Failure to Hold a TEPS III BPA

Plaintiff argues "Harkcon is not eligible to compete in this procurement . . . because[] Harkcon does not hold a TEPS III BPA." Pl.'s MJAR at 33. Plaintiff claims "[t]he RFQ states that '[t]he Government intends to award a Task Order to the prospective Enterprise-Wide [TEPS III BPA] Schedule holder whose quote represents the best value to the Government.' *Id.* at 33–34 (emphasis omitted) (some alterations in original). As "Harkcon is a member of the MELE Associates CTA, and the MELE Associates BPA identifies MELE Associates—not Harkcon—as the BPA Holder, . . . [t]he RFQ . . . prohibited Harkcon from competing in this procurement." *Id.* at 34 (citing AR Tab 51b at 2827 (MELE Associates' BPA)). Once again, plaintiff claims if the "Agency had excluded Harkcon as required, [plaintiff] would be the only technically acceptable offeror, meaning AMSG would be in line for award." *Id.* Additionally, plaintiff argues "the TEPS III BPA ordering procedures preclude Harkcon from submitting a quotation . . . because Harkcon did not sign the BPA award document." *Id.* at 33, 35. Plaintiff points to the TEPS III BPA which "defines 'Order Leaders' as 'the CTA Team Leader or CTA

Team Member that is responsible for performance of work under individual orders,'" and "[t]he BPA states that '[a]ll CTA Team Members shall sign the BPA award document as a concurrence in order to have privity of contract and allow the placement of Orders directly with the Order Leader.'" *Id.* at 35 (citing AR Tab 51b at 2826 (MELE Associates' BPA)) (emphasis omitted). Plaintiff again asserts "Harkcon is not the CTA Leader," but rather "a CTA Team Member," and as such "can serve as the Order Leader only if it has 'sign[ed] the BPA award document as a concurrence in order to have privity of contract and allow the placement of Orders directly with the Order Leader.'" *Id.* (alterations in original). Plaintiff alleges "[a] MELE Associates representative is the only person who signed the BPA Standard Form 1449," *id.* at 36 (citing AR Tab 51b at 2822 (MELE Associates' BPA), whereas "[t]he only document Harkcon signed is the 'BPA Agreement Form,'" *id.* (citing AR Tab 54a at 2888 (Harkcon BPA Agreement Form)).

The government responds "Harkcon submitted its quotation as a member of a Contractor Teaming Arrangement (CTA) relying on MELE Associates' TEPS III BPA as the basis authorizing Harkcon to submit a quotation," and "[t]he TEPS III BPA ordering guide provides that BPA's were established solely with CTA leaders, but that both the CTA leaders and CTA members have privity of contract with the Government as a result of the CTA members' FSS contracts." Gov't's Cross-MJAR at 32–33 (citing AR Tab 51a at 2808 (NNSA TEPS III Ordering Guide)) (other citations omitted). The government continues "the ordering guide states that the 'Government will have privity of contract with each business within the teams . . . For Task Order awards, the Team Leaders will select an Order Lead. Orders will be issued directly against the Order Lead's [FSS] contract.' . . . Accordingly, BPA's would not be established with CTA members. . . . There is no dispute that Harkcon is identified as a CTA member in MELE's TEPS III BPA nor that Harkcon holds an FSS contract." *Id.* at 33 (citations omitted) (alterations in original). In response to plaintiff's "contention that the RFP was 'limited' to BPA Holders," the government asserts "the BPA specifically allows for CTA team members to enter into an 'order with the Government" as the 'Order Lead.'" *Id.* (citing AR Tab 51b at 2826 (MELE Associates' BPA)). As to plaintiff's second argument, the government responds "Harkcon signed the 'BPA award document' per the terms of the BPA." *Id.* (citations omitted). The government asserts the "TEPS III BPA specifically explains that 'CTA Team Members will NOT be awarded their own BPAs.'" *Id.* (quoting AR Tab 51b at 2826 (MELE Associates' BPA)). The government argues this means "Harkcon could not, therefore, sign a separate TEPS III BPA directly with the Government," and so rather "signed a BPA Agreement Form which acts as the 'BPA award document.'" *Id.* (quoting AR Tab 54a at 2888 (Harkcon BPA Agreement Form). The agreement form, the government stresses, "(1) correctly lists the MELE BPA number, (2) states that the contractor will agree to 'the following terms of a BPA EXCLUSIVELY WITH' NNSA, (3) explains that the 'following contract services/products can be ordered under this BPA. All orders placed against this BPA are subject to the terms and conditions of the contract . . .', and (4) describes the rights and obligations under 'this BPA.'" *Id.* (quoting AR Tab 54a at 2888 (Harkcon BPA Agreement Form)). The government adds Harkcon's not signing the BPA does not entail it "lacks privity with the Government," as "[a] BPA is not a contract, but rather BPAs are 'frameworks for future contracts.'" *Id.* (citations omitted). The government also argues plaintiff "will have difficulty prosecuting this claim given that it signed the exact same document on the same day as Harkcon," and so "[i]f Harkcon's document is deficient, then so is" plaintiff's. *Id.* at 34 n.12 (citation omitted) (emphasis omitted).

### F.    Plaintiff's Argument it is Entitled to a Permanent Injunction

Plaintiff argues it is entitled to injunctive relief.  Pl.'s MJAR at 38.  First, plaintiff argues it "will suffer irreparable harm absent a permanent injunction," namely, it "will lose the profits it would have realized under this contract."  *Id*. (citations omitted).  Second, plaintiff contends "the balance of harms favors injunctive relief" because, "[i]n contrast to the irreparable harm [plaintiff] will suffer absent injunctive relief, NNSA will suffer no meaningful harm."  *Id*. at 39.  Plaintiff asserts it "will lose this significant work and its incumbent contract workforce."  *Id*.  Third, plaintiff argues "the public interest (and benefit) also weighs on the side of injunctive relief," as "necessary to 'preserve[] the integrity of the procurement system, promote[] healthy competition, and bolster[] public confidence in the federal procurement system.'"  *Id*. (citations omitted).

The government responds "[c]ourts . . . should enjoin performance 'only in extremely limited circumstances,'" and "a movant is confronted by a more substantial burden of proof when it seeks injunctive relief which would interfere with and infringe upon governmental operations if granted."  Gov't's Cross-MJAR at 35 (citations omitted)  The government contends (1) plaintiff "has not succeeded on the merits" as "NNSA followed all pertinent requirements and did not abuse its discretion by selecting Harkcon;" (2) plaintiff did not suffer irreparable harm as it "has not been deprived of the opportunity to fairly compete, because the agency acted properly;" (3) "[t]he balance of hardships in this case favors the Government because ordering re-procurement would unnecessarily result in the expenditure of Government funds and resources and would unnecessarily intrude upon the contracting officer's discretion;" and (4) injunctive relief is not necessary "to preserve the integrity of the procurement system," as "NNSA in this procurement sought the best value and has acted within its discretion, . . . [t]he integrity of the process is always at issue in a procurement, [and] the public interest lies with avoiding disruption in a procurement that was conducted properly."  *Id*. at 36 (citations omitted).

## V.    Applicable Law

### A.    Motion to Conduct Discovery and Supplement the Administrative Record

"It is well settled that the 'primary focus' of the court's review of agency decision making 'should be the materials that were before the agency when it made its final decision.'"  *Joint Venture of Comint Sys. Corp. v. United States*, 100 Fed. Cl. 159, 166 (2011) (quoting *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 345, 349–50 (1997)).  "Granting agencies the authority to retroactively create an administrative record once the adversarial process has commenced, however, 'may preclude the "substantial inquiry" and "thorough, probing, in-depth review" the court must perform' in bid protests."  *Id.* (quoting *Mike Hooks, Inc. v. United States*, 39 Fed. Cl. 147, 156 (1997) (citations omitted)).  The Federal Circuit established the standard for supplementation of the administrative record in *Axiom Resource Management, Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009).  In *Axiom*, the Federal Circuit explained, "[t]he purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into effectively de novo review.'"  564 F.3d at 1380 (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)).  "Thus, supplementation of the record should be limited

to cases in which 'the omission of extra-record evidence precludes effective judicial review.'" *Id.* (quoting *Murakami*, 46 Fed. Cl. at 735). When performing this analysis, the court is "required to explain why the evidence omitted from the record frustrate[s] judicial review as to the ultimate question of whether the award . . . was arbitrary and capricious." *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (citing *Axiom*, 564 F.3d at 1379–80).

### B.    Bid Protest Jurisdiction and APA Standard of Review

The Tucker Act provides this court jurisdiction over "action[s] by an interested party objecting to a solicitation by a federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (1996). The term "interested party" means "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001). "[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (citations omitted). This court evaluates bid protests under the framework laid out in Section 706 of the Administrative Procedure Act. 28 U.S.C. § 1491(b)(4); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); MATTHEW H. SOLOMSON, COURT OF FEDERAL CLAIMS: JURISDICTION, PRACTICE, AND PROCEDURE § 8-37 (2016) (first citing 28 U.S.C. § 1491(b)(4); and then quoting 5 U.S.C. § 706(A), (D)); 28 U.S.C. § 1491(b)(4) (2024) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.")). "[T]he proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004) (quoting *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000)). An agency's action is arbitrary, capricious, or an abuse of discretion if "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or . . . is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Given the arbitrary and capricious standard is "highly deferential," a reviewing court must "sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). A court, therefore, will not "substitute its judgment" for the agency's so long as the agency's decision was reasonable. *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 998–99 (Fed. Cir. 2018) (quoting *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003)).

### C.    Judgment on the Administrative Record in a Bid Protest

"[Rule] 52.1(c) [of the Rules of the United States Court of Federal Claims ('RCFC')] provides for judgment on the administrative record." *Huntsville Times Co. v. United States*, 98 Fed. Cl. 100, 104 (2011); *see also Bannum, Inv. v. United States*, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). A court may set aside an agency action if plaintiff has proven "either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332 (citations omitted). The rational basis test requires the court to ask "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Dell Fed. Sys., L.P.*, 906 F.3d at 992 (quoting *Banknote*, 365 F.3d at 1351). "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" *Impresa*, 238 F.3d at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)) (other citations omitted). "*[D]e minimis* errors do not require the overturning of an award." *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citations omitted). A bid protest plaintiff must establish alleged "errors in the procurement process significantly prejudiced" plaintiff by showing "there was a 'substantial chance' it would have received the contract award but for the errors." *Bannum*, 404 F.3d at 1353 (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)) (other citations omitted).

### D.    Permanent Injunction

In a bid protest case, "the Court of Federal Claims 'may award any relief that the court considers proper, including declaratory and injunctive relief.'" *Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1375 (Fed. Cir. 2024) (quoting 28 U.S.C. § 1492(b)(2)). Before granting injunctive relief, the trial court "must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Id.* (quoting *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)). If the trial court awards injunctive relief, it may fashion its own remedy to fit the contours of the decision. *See Turner Constr. Co. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011) (explaining "the Court of Federal Claims has broad equitable powers to fashion an appropriate remedy").

### VI.    Whether Harkcon Materially Misrepresented [XXXXXXX]'s Availability to Serve as Program Manager and Whether to Supplement the Administrative Record with Limited Discovery

Plaintiff first argues the Agency's evaluation of Harkcon was arbitrary and capricious because "Harkcon's quotation contains material misrepresentations." *See* Pl.'s MJAR at 14. Specifically, plaintiff argues Harkcon's proposal of "[XXXXXX] as its Program manager and as a full-time, on-site (New Mexico) resource," *id.* falsely represented [XXXXXX]'s ability to perform as the program manager, *id.* at 18. Plaintiff asserts Mr. [XXX] was "Chief Operating Officer, . . . responsible for managing and directing Harkcon operations . . . based in Fredericksburg, Virginia," and he "serves as the program manager for two other active contracts." *Id.* Plaintiff also relies on the declaration of its employee, [XXXXXXXX], which

alleged after the Agency awarded the contract, employees at Harkcon told her Harkcon "is actively recruiting for the Program Manager position" and "Mr. [XXX] . . . does not intend to serve as the Program Manager." *Id.* at 18–19 (quoting AR Tab 39a at 1722 (Declaration of [XXXXXXXX])). Plaintiff submitted the declaration as part of its post-award protest at the GAO. *See* AR Tab 39a at 1699 (Index of Exhibits in GAO protest). The Agency relied on this misrepresentation, plaintiff argues, since the "Agency assigned Harkcon three strengths based on Mr. [XXX]'s resume . . . [and] then assigned Harkcon an exceptional rating for the Key Personnel Resume Factor." *Id.* at 20–21. If the Agency had not made this error, plaintiff argues it would have been the only qualified bidder, and it would have been awarded the task order. *See id.* at 14. The Court first evaluates whether the evidence in the AR before the Agency establishes a material misrepresentation in Harkcon's proposal such that the Agency's award was arbitrary and capricious. Second, the Court determines whether the [XXX] declaration, in addition to the evidence in the AR, establishes a material misrepresentation in Harkcon's proposal such that the Agency's award was arbitrary and capricious. Third, the Court reviews plaintiff's request for leave to conduct discovery and supplement the administrative record.

### A.    Whether the Evidence in the Administrative Record Before the Agency Establishes a Material Misrepresentation

Plaintiff alleges Harkcon's representations Mr. [XXX] would serve as the on-site program manager for the contract in New Mexico were false statements relied upon by the Agency. *See* Pl.'s MJAR at 18. Plaintiff argues this representation was false because [XXX] was "Chief Operating Officer . . . responsible for managing and directing Harkcon operations," which "is based in Fredericksburg, Virginia," and he "serves as the program manager for two other active contracts." *Id.* Plaintiff alleges Mr. [XXX] was Harkcon's president as well, citing "the Harkcon website prior to quotation submission." *Id.* These responsibilities, plaintiff argues, make any suggestion [XXX] "could serve as the on-site, New Mexico, full-time Program Manager under this contract . . . not credible." *Id.*

The Federal Circuit provided in *Planning Research Corporation v. United States*, "the submission of a misstatement . . . which materially influences consideration of a proposal should disqualify the proposal . . . . Any further consideration of the proposal in these circumstances would provoke suspicion and mistrust and reduce confidence in the competitive procurement system." 971 F.2d 736, 741 (Fed. Cir. 1992) (quoting *In re Informatics, Inc.*, 57 Comp. Gen. 217, 225 (Jan. 20, 1978)). Such material misrepresentations "taint[] the bidding and evaluation process." *Id.* at 740–41. In the Court's 2023 Order in *Health Net Federal Services v. United States,* the Court surveyed other cases which further outline the standard for misrepresentation. 168 Fed. Cl. 1 (2023). Notably, in *Impresa Construzioni Geom. Domenico Garufi v. United States*, the plaintiff protested the award of a contract to another bidder, alleging the awardee misrepresented a certification that their principals had not been convicted of fraud or a similar offense in the last three years. 238 F.3d 1324, 1339 (Fed. Cir. 2001). A former principal of the awardee had, however, been convicted of fraud in connection with a different government contract within the last three years. *Id.* at 1328, 1339–40. This court held the contracting officer could have reasonably ignored the fraud convictions because nothing in the record "required a determination that the facts available to the [agency] conflicted with representations filed by the awardee." *Id.* at 1330, 1340. According to this court, the decision to accept the certification was

therefore not arbitrary and capricious. *Id.* The Federal Circuit disagreed and remanded to this court to allow for a "limited deposition of the contracting officer" to: (1) identify the contracting officer's actual reasons for accepting the certification; and (2) decide if those reasons were arbitrary and capricious. *Id.* at 1327, 1340. The Federal Circuit stated, under the legal standard for material misrepresentations, "[i]t is well-established that a contracting officer should consider disqualifying a proposed contractor if a material misrepresentation is made. . . . Under these circumstances, we must assume that the contracting officer considered the certification and concluded that it was not misleading. The question is whether this was arbitrary." *Id.* at 1339 (citations omitted). The Federal Circuit decided the failure of the awardee to report the indictment of its previous principal raised "serious questions" as to whether there had been a material misrepresentation. *Id.* at 1340. The record did not include information as to why the contracting officer decided to accept the certification, so the Federal Circuit remanded to require a deposition of the contracting officer to explain. *Id.*

Here, plaintiff claims Harkcon misled the Agency by proposing Mr. [XXX] as the program manager when he held various other positions at Harkcon which would make performance on-site in New Mexico difficult. *See* Pl.'s MJAR at 18. Harkcon explained at oral argument Mr. [XXX] intends to "take off his present COO hat and be physically present in New Mexico" once the contract commences. Tr. at 12:17–22. Harkcon stated "other individuals . . . would come on board to take over [Mr. [XXX]'s program manager] roles" on the contracts in Virginia. Tr. at 12:12–14. Mr. [XXX], for his part, is "ready to go to New Mexico when called upon to be there." Tr. at 12:24–25. Moreover, the Agency twice requested via email Harkcon clarify whether Mr. [XXX] would be available on-site in New Mexico and would perform at a full-time level, and Harkcon twice answered in the affirmative. *See* AR Tab 17b at 1050 (Response to Email Clarification Notice #1); AR Tab 19a at 1053–1054 (Response to Email Clarification Notice #2). In October 2024, the Agency asked Harkcon to "clarify whether your proposed Key Personnel will be available on-site . . . at OST HQ," and Harkcon unequivocally stated "[y]es, Harkcon, Inc.'s proposed Program Manager will be available on-site at OST HQ per the [Project Work Statement] requirements." *Id.* In another exchange in December 2024, the Agency asked Harkcon to clarify whether "it proposes to capture 100% of the incumbent staff," including the incumbent program manager. AR Tab 19a at 1053 (Response to Email Clarification Notice #2). Harkcon clarified it was "proposing Mr. [XXX] as the key person, but could capture the incumbent [program manager] upon award, with permission." *Id.* Notably, plaintiff agreed at oral argument it is "theoretically possible" for Mr. [XXX] to drop some or all of his ties to Virginia to be the on-site program manager in New Mexico and simply disputed whether it was "realistic" for him to do so. Tr. at 20:2–8 ("[PLAINTIFF: C]ould he . . . cut off his responsibilities to the company he runs? Could he cut off the responsibilities to the other federal contracts he's running? . . . is that theoretically possible? Sure."). Furthermore, even if Mr. [XXX] does not shed 100% of his other duties at Harkcon, his resume indicates he commonly wears multiple hats at once as an employee of Harkcon—Mr. [XXX] was the program manager for two multi-million-dollar contracts with the government at once from 2012–2016. *See* AR Tab 13b at 633–34 (Mr. [XXX]'s resume) (listing Mr. [XXX] as program manager for one $16 million contract from 2012–2016 and another "20+ million" contract from 2011–2017). For one of those contracts, Mr. [XXX] "directed the operations of up to 60 Harkcon personnel at nine locations across 4 time zones." *See id.* Mr. [XXX] managed two other multi-million-dollar contracts at once again from 2019–2021. *See id.* During all of these

times, Mr. [XXX] also served as Harkcon's COO. *See id.* Plaintiff agreed it is "possible" for Mr. [XXX] to "cut off his ties" in Virginia and perform as program manager, Tr. at 20:6–7, and Mr. [XXX]'s resume indicates he commonly handles numerous responsibilities at the same time as a Harkcon employee, *see* AR Tab 13b at 633–34 (Mr. [XXX]'s resume). Given the record before the Agency supports Harkcon's statements Mr. [XXX] was able and willing to perform as program manager, the Court finds Harkcon's proposal of Mr. [XXX] as the program manager was "not misleading," and it was not arbitrary for the Agency to conclude the same. *See Impresa*, 238 F.3d at 1338–39 ("Under these circumstances, we must assume that the contracting officer considered the certification and concluded that it was not misleading. The question is whether this was arbitrary.") ("the agency decision is entitled to a presumption of regularity. . . . Because of that presumption of regularity, the agency should not be required to provide an explanation unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious.") (citations omitted).

### B.    Whether the Evidence Establishes a Material Misrepresentation if the Court Considers the [XXX] Declaration

The Court further considers if the [XXX] Declaration submitted by plaintiff raises evidence of misrepresentation. Incumbent program manager [XXXXXXX] claims in a declaration Mr. [XXX] "indicated [to her] he does not intend to serve as the Program Manager" and "Harkcon is actively recruiting for the Program Manager position." AR Tab 39a at 1721 (Declaration of [XXXXXXX]). Ms. [XXX] alleges Harkcon employees explained [XXX] was inserted into the proposal only after "Harkcon discovered the person which it intended to propose as its Program Manager in its quotation did not have the required security clearance," and Harkcon never intended for [XXX] to serve as the program manager. *Id.* at 1720–21.

According to the Supreme Court, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). "The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into effectively de novo review.'" *Axiom Res. Mgmt, Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (citations omitted); *see also Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1348 (Fed. Cir. 2021).

Plaintiff agrees the [XXX] Declaration was not before the Agency prior to its award decision nor could it have been, as it was prepared as part of plaintiff's protest at GAO and addressed solely post-award events. *See* Tr. at 47:2–7 ("THE COURT: The only reason why [the declaration is] in the record is because of GAO. But you agree that agency did not consider [the declaration] . . . before . . . because [it] occurred after the award. [PLAINTIFF]: Of course."). The declaration was not before the Agency when it made its decision and is therefore beyond the "focal point" of the Court's review. *See Camp*, 411 U.S. at 142. Accordingly, the Court declines to consider the [XXX] declaration. *Axiom*, 564 F.3d at 1381 ("The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into effectively de novo review.'").

If the Court were to consider the [XXX] declaration, plaintiff argues the declaration "confirms that Mr. [XXX] did not intend to serve as the Program Manager." Pl.'s MJAR at 18. Harkcon proposed Mr. [XXX] as its program manager and twice expressly affirmed Mr. [XXX]'s availability to perform in New Mexico. *See* AR Tab 17b at 1050 (Response to Email Clarification Notice #1); AR Tab 19a at 1053–54 (Response to Email Clarification Notice #2). This directly contradicts the declaration's claim "Mr. [XXX] . . . does not intend to serve as the Program Manager." AR Tab 19a at 1721 (Declaration of [XXXXXXXX]). At oral argument, Harkcon confirmed it always intended for Mr. [XXX] to perform as the program manager. *See* Tr. at 10:22–25 ("THE COURT: Mr. [XXX] was always planned to be the PM? [PLAINTIFF]: Yes, and he still is ready, willing, and able."). While Harkcon agrees Mr. [XXX] "did have a conversation" with Ms. [XXX], Tr. at 11:3–8, Harkcon maintains "he did not tell her that he would not be available or would not be working," Tr. at 10:4–8. This contradicts the declaration's claim Harkcon only proposed Mr. [XXX] as program manager after "discover[ing] the person whom Harkcon intended to propose as its Program Manager in its quotation did not have the required security clearance." AR Tab 19a at 1721 (Declaration of [XXXXXXXX]). Nothing on the face of Harkcon's proposal, in its communications with the Agency, or in the record before the Agency supports the declaration's allegations, and the Agency did not have any of the facts alleged before it when it evaluated Harkcon's proposal. Moreover, even if the allegations in the declaration were true, the Agency was aware Harkcon may attempt to capture the incumbent program manager "with permission, to maintain continuity of staff." AR Tab 19a at 1053 (Response to Email Clarification #2). The solicitation expressly allows for substituting the program manager with the consent of the contracting officer. *See* AR Tab 9 at 100–01 (Solicitation RFQ) ("Before removing, replacing, or diverting any of the listed or specified personnel, the Contractor must: (1) Notify the Contracting Officer reasonably in advance; (2) submit justification (including proposed substitutions) in sufficient detail to permit evaluation of the impact on this contract; and (3) obtain the Contracting Officer's written approval."). Even if Harkcon was exploring alternative candidates for program manager, whether it be the incumbent Ms. [XXX] or another individual, at most that establishes "Harkcon is actively recruiting for the Program Manager position." AR Tab 19a at 1721 (Declaration of [XXXXXXXX]). Given the solicitation expressly allows for substituting the program manager, the Court finds Harkcon's representations to the Agency regarding Harkcon's intent for Mr. [XXX] to serve as program manager were "not misleading," and its not arbitrary for the Agency to conclude the same. *See Impresa*, 238 F.3d at 1338–39 ("Under these circumstances, we must assume that the contracting officer considered the certification and concluded that it was not misleading. The question is whether this was arbitrary.") ("the agency decision is entitled to a presumption of regularity. . . . Because of that presumption of regularity, the agency should not be required to provide an explanation unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious.") (citations omitted).

Plaintiff argues this protest is substantially similar to *Planning Research* and the Court should reach the same result. *See, e.g.*, Tr. at 20:9–23. There, the Federal Circuit upheld a decision to terminate a contract award after finding the awardee materially misrepresented the personnel it intended to use for the contract. *Planning Research*, 971 F.2d at 739, 743. The awardee originally proposed capturing a substantial portion of the incumbent staff, but shifted its plan to use all of its own staff after being informed the agency would treat capturing incumbents as a weakness. *Id.* at 740. During bidding, the awardee "repeatedly represented and assured [the

agency] that it would staff the contract with the personnel for whom résumés had been provided. *Id.* Once the contract was awarded, however, more than half of the contract staff the awardee hired were not among the personnel it proposed to the agency. *Id*. at 739. The agency also discovered the awardee had submitted proposed personnel resumes "without ascertaining whether any of the people would be available to work on the . . . contract," and "did not indicate during the course of the negotiations that there would be any changes in the proposed staffing of the contract." *Id.* at 742. As a result, the Federal Circuit agreed the awardee "misrepresented the personnel who would perform the contract and intended to alter its staffing after award." *Id.* at 741. Here, unlike in *Planning Research*, Harkcon did not surprise the Agency by switching its personnel immediately after contract award. First, Harkcon has not substituted proposed personnel and it is only speculative whether Harkcon will ultimately choose to do so. The awardee in *Planning Research*, on the other hand, immediately began hiring incumbent personnel after award, contradicting its own proposal. *See id.* at 739. Second, if Harkcon does choose to substitute its program manager, it will be adhering to its representations to the Agency because Harkcon expressly informed the Agency prior to contract award it may attempt to capture the incumbent program manager. *See* AR Tab 19a at 1053–54 (Response to Email Clarification #2) (email exchange between the Agency and Harkcon where Harkcon confirmed it could capture the incumbent program manager). Third, the court in *Planning Research* accepted the GSA Board of Contract Appeals' finding the awardee "never even attempted, or intended, to provide the proposed personnel." *Planning Research*, 971 F.2d at 742. Here there is no such prior finding nor significant evidence Mr. [XXX] was unwilling or unable to perform in New Mexico. *Cf. Orion Intern. Techs. v. United* States, 66 Fed. Cl. 569, 576 (2005) (distinguishing *Planning Research* because of a lack of evidence the awardee never intended to hire the proposed key person). In *Planning Research*, disqualification of the awardee was proper because the awardee made "massive personnel substitutions" in a post-award bait-and-switch; here, Harkcon has not made any personnel substitutions, and speculation about whom Harkcon will employ does not warrant disqualification. *Cf. CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1579–82 (Fed. Cir. 1983) ("inferences of actual or potential wrongdoing" should be based on "hard facts," not "suspicion and innuendo").

The record before the Agency when it made its award to Harkcon contains no evidence establishing Harkcon's intent was different from that it proposed to the Agency. The Agency knew Harkcon might explore substituting its project manager, and any such substitution would have to be approved by the Agency. *See* AR Tab 19a at 1053 (Response to Email Clarification #2); AR Tab 9 at 100–01 (Solicitation RFQ). Even if Harkcon was contemplating changing its project manager from Mr. [XXX] to another individual, such contemplation alone does not show Harkcon's representations to the Agency were misleading. Accordingly, the Court finds Harkcon's representations regarding Mr. [XXX]'s availability to serve in New Mexico as program manager were "not misleading," and it was not arbitrary for the Agency to conclude the same. *See Impresa*, 238 F.3d at 1338–39 ("Under these circumstances, we must assume that the contracting officer considered the certification and concluded that it was not misleading. The question is whether this was arbitrary.") ("the agency decision is entitled to a presumption of regularity. . . . Because of that presumption of regularity, the agency should not be required to provide an explanation unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious.") (citations omitted).

**C.    Whether to Grant Plaintiff's Motion for Limited Discovery and Supplementation**

Plaintiff asks the Court to "permit [plaintiff] to depose Mr. [XXX] and Ms. [XXX] and submit the document requests identified . . . and, in turn, to supplement the record with the transcripts and documents." Pl.'s Mot. for Disc. at 11. The "request for discovery only relate[s] to the misrepresentation claim." Tr. at 39:25–40:1. "[S]upplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'" *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)). The Court is "required to explain why the evidence omitted from the record frustrate[s] judicial review as to the ultimate question of whether the award . . . was arbitrary and capricious." *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (citing *Axiom*, 564 F.3d at 1379–80).

In the Court's 2023 Order in *Health Net Federal Services v. United States,* 168 Fed. Cl. 1, 8–12 (2023), the Court surveyed several other cases which outline the standard for granting discovery and supplementation in a misrepresentation case. These cases included: *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324 (Fed. Cir. 2001); *Oracle Am., Inc. v. United States*, No. 18-1880, 2019 WL 354705 (Fed. Cl. Jan. 28, 2019); *Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338 (2004)); and *Golden IT, LLC v. United States*, 157 Fed. Cl. 680 (2022).

First, in *Impresa*, the plaintiff protested the award of a contract to another bidder, alleging the awardee misrepresented a certification their principals had not been convicted in the last three years and were not presently indicted. 238 F.3d at 1339. The Court of Federal Claims held the contracting officer could have reasonably ignored the awardee's past receivership and present indictment (which contradicted the awardee's certification) because nothing in the record "required a determination that the facts available to the [agency] conflicted with representations filed by the awardee." *Id*. at 1330, 1340. The Federal Circuit disagreed and remanded to this court to allow for a "limited deposition of the contracting officer" to: (1) determine his actual reasons for accepting the certification; and (2) decide if those reasons were arbitrary and capricious. *Id.* at 1327, 1340. The Federal Circuit stated "[t]he failure of [the awardee] to report the findings and indictment of the Italian courts, which appear to have been before the contracting officer, raises serious questions as to whether the awardee made a material misrepresentation on the certificate. . . . Unfortunately, the record does not include any articulation of what the contracting officer concluded when he reviewed the certification . . . , [so] we must require an explanation by deposition." *Id.* at 1339–40 (citations omitted).

Second, in *Oracle,* plaintiff Oracle filed a pre-award bid-protest related to the DoD's Joint Enterprise Defense Infrastructure ("JEDI") Cloud procurement. 2019 WL 354705, at *1. Plaintiff "filed a motion to complete and supplement the administrative record ('AR') and for leave to conduct limited deposition and document discovery." *Id.* The court denied plaintiff's motion because "[the] government . . . included in the AR the documents that it developed and

considered in making the decisions at issue, and plaintiff has not made a sufficient showing for this court to permit supplementation or limited discovery." *Id.* at *6.  The court reasoned:  "To be granted leave to conduct limited discovery, the protestor must show a 'likelihood that discovery would lead to evidence that would meet the clear and convincing standard' to overcome the presumption of regularity on the merits." *Id.* at *3 (quoting *Starry*, 125 Fed. Cl. at 623).  "The protestor must 'make a threshold showing of "motivation for the [g]overnment employees in question to have acted in bad faith or conduct that is hard to explain absent bad faith," and [show] that "discovery could lead to evidence which would provide the level of proof required to overcome the presumption of regularity."'" *Id.*  (second alteration in original) (quoting *Starry*, 125 Fed. Cl. at 622).

Third, in *Orion*, plaintiff protested the Army's award of a contract for staff support, alleging misrepresentation by the awardee related to its personnel.  60 Fed. Cl. at 339–41.  Plaintiff filed a motion for discovery seeking depositions of the awardee's personnel and the Army's Source Selection Authority (SSA) to unearth knowledge about the awardee's employment history during the solicitation.  *Id.* at 340, 344.  Orion explained "this discovery [would] determine . . . whether Fiore and its representatives misrepresented the identities of its key employees in either its qualification package or its oral presentation to the Army." *Id.*  The court reasoned, "a plaintiff needs more than innuendo or suspicion to entitle it to discovery seeking such evidence." *Id.* at 344 (citing *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1324 n.2 (Fed. Cir. 2003)).  The court then granted and denied the motion in part, based on its analysis of whether plaintiff Orion met the evidentiary threshold for bad faith in its analysis.  *Id.* at 346.  Referring to the granted aspect of the motion, the court wrote:  "[G]iven th[e] possibility [of misrepresentation], [the awardee's] discussions with [the employee], and the plans and contingent plans that he made based on these conversations may be relevant to the present litigation, and are not something that would ever normally be found in an agency's record." *Id.* at 345.

Fourth, in *Golden IT*, plaintiff Golden IT filed a post-award protest challenging the Census Bureau's award of a general IT support contract and raised a plausible misrepresentation claim involving the awardee's personnel.  157 Fed. Cl. at 684–85.  The plaintiff moved to supplement the administrative record with a "copy of the LinkedIn profile of [the awardee's] proposed key personnel" in support of its misrepresentation claim.  *Id.* at 686.  Plaintiff argued part of the Census Bureau's evaluation was arbitrary because the awardee improperly characterized one of its key personnel as still employed by the awardee at the time of submission, and therefore, the Census Bureau "should have assigned a weakness to [awardee's] quote—instead of a significant strength." *Id.* at 699.  The court found plaintiff's claim of misrepresentation of a key personnel was enough to trigger discovery because  neither party could "explain[] during oral argument how th[e] [c]ourt could possibly evaluate a plausible misrepresentation claim based upon only the evidence in the government's possession," further demonstrating supplementation was necessary.  *Id.*  Because it could not "possibly evaluate a plausible misrepresentation claim based upon only the evidence in the government's possession," the court determined supplementation was appropriate.  *Id.*

**(1)    Whether Supplementation is Necessary for Effective Judicial Review**

Plaintiff asks the Court to "permit [plaintiff] to depose Mr. [XXX] and Ms. [XXX] and submit the document requests identified above and, in turn, to supplement the record with the transcripts and documents." Pl.'s Mot. for Disc. at 11. "The focus of judicial review . . . remains the administrative record, which should be supplemented *only if the existing record is insufficient to permit meaningful review* consistent with the [Administrative Procedure Act]." *Axiom Resource Management, Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (emphasis added). Under *Impresa*, the Agency's decision to accept Harkcon's proposal notwithstanding the alleged misrepresentation must not be "arbitrary." 238 F.3d at 1339. Here, Harkcon proposed Mr. [XXX] as its program manager and consistently affirmed to the Agency he was willing and able to perform his role in New Mexico even after the Agency twice sought specific clarification on that point. *See* AR Tab 17b at 1050 (Response to Email Clarification Notice #1); AR Tab 19a at 1053–1054 (Response to Email Clarification Notice #2) (email exchanges between the Agency and Harkcon where Harkcon confirmed [XXX] would be available in New Mexico). The Agency had no reason to suspect Harkcon's proposal contained any misrepresentation. The deposition testimony to be developed and the non-record documents plaintiff seeks were also not before the Agency and therefore could not shed light on whether the Agency's decision Harkcon's proposal was acceptable was "arbitrary." *See Impresa*, 238 F.3d at 1339. Similarly, *Orion* explains "a plaintiff needs more than innuendo or suspicion to entitle it to discovery." 60 Fed. Cl. at 344. A bald, disputed declaration from one of plaintiff's own employees alleging Harkcon admitted it would, at some point before contract start, replace its proposed manager does not rise above innuendo or suspicion. In the same vein, the court in *Oracle* required the plaintiff to "ma[k]e a sufficient showing" that "discovery would lead to evidence" sufficient for the Court to answer the ultimate question on the merits. *See* 2019 WL 354705, at *3, 6 ("To be granted leave to conduct limited discovery, the protestor must show a "likelihood that discovery would lead to evidence that would meet the clear and convincing standard" to overcome the presumption of regularity on the merits."). Plaintiff's self-serving allegations and suspicions of misrepresentation based on Mr. [XXX]'s other responsibilities at Harkcon do not suffice to make this showing. Plaintiff's allegations of Harkcon's intent as to future staffing actions also distinguishes this case from the discovery granted in *Golden IT*. There, the plaintiff alleged a particular employee was not employed with the awardee when the awardee specifically represented to the agency he was. *Golden IT*, 157 Fed. Cl. at 699. Supplementation was then necessary to determine whether the employee was employed by the awardee. *Id.* Plaintiff's allegations are far less concrete—plaintiff does not allege Harkcon misrepresented the employment status of Mr. [XXX], but instead alleges an active Harkcon employee may not conform with the promises in Harkcon's proposal. *See* AR Tab 39a at 1720–21 (Declaration of [XXXXXXX]) (alleging Harkcon is "is actively recruiting for the Program Manager position" and Mr. [XXX] "does not intend to serve as the Program Manager"). Likewise, plaintiff's request for discovery to obtain evidence it would then seek to supplement is far from the single, preexisting piece of evidence the court allowed in *Golden IT*. *See* 157 Fed. Cl. at 686 (plaintiff sought to supplement record with "LinkedIn profile of [awardee's] proposed key personnel"). The above cases illustrate plaintiff is required to present "more than innuendo and suspicion to entitle it to discovery," *Orion*, 60 Fed. Cl. at 344, on the ultimate question of whether the Agency's decision to accept Harkcon's bid despite alleged inconsistencies is "arbitrary," *see Impresa*, 238 F.3d at 1339. The Court finds the allegations in plaintiff's declaration and the alleged inconsistencies between Mr. [XXX]'s performance as program manager and his other roles at Harkcon fall short of this requirement. Accordingly, plaintiff has not shown the "extra-

record evidence" is necessary for "effective judicial review." *See Axiom*, 564 F.3d at 1380 (citation omitted).

In any event, plaintiff stated at oral argument and in its briefing its misrepresentation claim can succeed without discovery and supplementation of the record. *See* Tr. at 40:3–8 ("THE COURT: And it sounds like . . . you cannot support a misrepresentation claim without discovery? [PLAINTIFF]: I believe we can, your honor, because I think we have the . . . we have evidence of misrepresentation."); Pl.'s Mot. for Disc. at 5 ("As detailed in AMSG's MJAR, the record contains substantial evidence showing that Harkcon misrepresented its intent for Mr. [XXX] to serve as the Harkcon Program Manager, and *that evidence suffices for the Court to grant judgment in AMSG's favor*.") (emphasis added). The primary review under *Axiom* is therefore whether omission of the evidence which plaintiff might obtain in discovery would "preclude[] effective judicial review." 564 F.3d at 1380 (citation omitted). "The focus of judicial review . . . remains the administrative record, which should be supplemented *only if the existing record is insufficient to permit meaningful review* consistent with the [Administrative Procedure Act]." *Id*. at 1381 (emphasis added). Plaintiff's briefing states this is an "uncommon case where substantial evidence exists in the administrative record for the Court to find that Harkcon made a material misrepresentation." Pl.'s Mot. for Disc. at 10. Given plaintiff agrees its misrepresentation claim can succeed based only on the "substantial evidence" in the record, *id.*, then the omission of additional extra-record evidence does not "preclude[] effective judicial review." *See Axiom*, 564 F.3d at 1380 (citation omitted). Supplementation is only appropriate where "the existing record is insufficient." *Id*. at 1381. As the Federal Circuit held in *AugustaWestland*, this court "abuse[es] its discretion" if it grants supplementation when "the administrative record [is] sufficient." 880 F.3d at 1331. Plaintiff agreed the record without supplementation is sufficient "for the Court to grant judgment in [plaintiff]'s favor." Pl.'s Mot. for Disc. at 5. Accordingly, the Court finds supplementation unnecessary here where plaintiff agrees the record before the Agency is sufficient to prove its misrepresentation claim. *See Camp*, 411 U.S. at 142 ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record initially made in the reviewing court.").

> **(2)    *Axiom* Expressly Guards Against Supplementing the Record Based on Speculative Claims of Misrepresentation**

The Federal Circuit's strict standard for supplementation articulated in *Axiom* is designed to "guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into effectively de novo review.'" 564 F.3d at 1380 (quoting *Murakami*, 46 Fed. Cl. at 735). "Thus, supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'" *Id*. (quoting *Murakami*, 46 Fed. Cl. at 735). Any other rule would invite every protest to stray into developing "some new record made initially in the reviewing court," which the Supreme Court has expressly cautioned against. *Id*. (quoting *Camp*, 411 U.S. at 142). "[S]upplementation of the record should be very narrowly confined, . . . and the court must guard against unsupported or speculative claims of inaccurate representations being used to circumvent limits on supplementation." *Ala. Structures, Inc. v. United States*, 144 Fed. Cl. 80, 85 (2019) (citing *Axiom*, 564 F.3d at 1379–80). Otherwise, if a disappointed bidder could be granted leave to conduct discovery merely by submitting a declaration that an awardee's intent was different from its proposal, it would invite *any*

unsuccessful bidder looking to delay the award of a contract to a competitor to do so. Accordingly, plaintiffs "must adduce something more than allegations of counsel." *Id.* (citations omitted); *see also CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1579–82 (Fed. Cir. 1983) ("inferences of actual or potential wrongdoing" should be based on "hard facts," not "suspicion and innuendo"). A self-serving, post-award declaration with allegations of a successful bidder's post-award intent does not rise above "allegations of counsel," *see Ala. Structures, Inc.*, 144 Fed. Cl. at 85, nor above "suspicion and innuendo," which are insufficient to request discovery, *CACI, Inc.*, 719 F.2d at 1579–82. Tellingly, when the Court presented this question to counsel for plaintiff, counsel had no response:

> THE COURT: Well, so let's assume that there's a contract for whatever and it goes to another company in just a general bid protest. And the incumbent, the losing offeror --
>
> [PLAINTIFF]: Yes.
>
> THE COURT: -- has a declaration from their employee that is self-serving to disrupt the -- the loss of the contract. That sounds like it would be the type of thing that would relate to almost every bid protest that would come up.
>
> [PLAINTIFF]: No, Your Honor. I mean, look, I mean, first of all, Ms. [XXX] is not -- I don't think this declaration is self-serving, and let me tell you why. Ms. [XXX], like most -- many employees, is not -- she was offered a job by Harkcon.

*See* Tr. at 40:16–41:5. Plaintiff's motion to supplement the administrative record seeks to introduce "new evidence [and] 'convert the "arbitrary and capricious" standard into effectively de novo review.'" *Axiom*, 564 F.3d at 1380 (citations omitted). This new, extra-record evidence not before the Agency would force the Court to determine in the first instance whether Harkcon's proposal contained material inconsistencies or factual errors after the Agency already determined Harkcon's proposal was acceptable for award. This is precisely the form of supplementation and de novo review *Axiom* warns against. *Id.* Excluding plaintiff's search for extra-record evidence of a speculative misrepresentation does not "preclude effective judicial review," and entertaining such a request would invite "convert[ing] the 'arbitrary and capricious' standard into effectively de novo review." *Id.* Accordingly, plaintiff's Motion for Leave to Conduct Limited Discovery and Supplement the Administrative Record is denied.

## VII. Whether the Transition Plan in Harkcon's Quotation Violated the Terms of the Solicitation

In an answer to questions submitted by potential offerors, the Agency specified "due to the administrative nature of this requirement, the Government views the transition risk-level as low; therefore, will not have a transition period for this requirement." AR Tab 10d at 388 (Solicitation Q&A). Plaintiff insists Harkcon violated the solicitation terms by stating in its proposal "[w]e recognize and acknowledge that there is no transition period for this . . . contract, . . . however, based on transitioning similar contracts in the past, we know there will be a period of ramp up/transition of the current staff." Pl.'s MJAR at 26 (quoting AR Tab 13b at 628–29

(Harkcon Technical and Management Information)) (emphasis omitted). Plaintiff argues Harkcon should be disqualified because it proposed a four-phase transition plan to run from before the contract award through contract inception. *Id.*

Plaintiff argues the Agency's Q&A answer stating the contract will not have a transition period prohibits Harkcon's transition plan. *See* Tr. 61:4–8 ("THE COURT: Mr. Holman, what does Plaintiff rely on in stating that the RFQ did not permit any transition activities at all? [PLAINTIFF]: I think we're relying, Your Honor, on the bidder's question. It's Tab 10d, AR 388."). Plaintiff agrees the Court "needs to apply the plain language of the solicitation." Tr. at 64:9–11. Nothing in the plain language of the solicitation or the Q&A, precludes all transition activities—they state the contract "will not have a transition period." AR Tab 10d at 388 ("[D]ue to the administrative nature of this requirement, the Government views the transition risk-level as low; therefore, will not have a transition period for this requirement."). The government agreed at oral argument the Agency Q&A's preclusion of a "transition period" means "once the contract starts, you have to start performing on the contract" and "[t]here's not going to be a time where both contractors are performing at the same time," Tr. at 62:25–63:3, and further specified it "would expect anyone but the incumbent to propose a transition," Tr. at 60:10–11. A solicitation which forbade any transition activities whatsoever would make the solicitation patently uncompetitive because *only* the incumbent would be able to perform on day one with no transition at all, which would contradict the Agency's evaluation plan. *See* AR Tab 8 at 78 (NNSA's Evaluation Plan) ("Vendors are reminded that this is a *competitive* requirement conducted under FAR Part 8 against the TEPS III BPA." (emphasis added)). Merely because the solicitation does not contemplate a "transition period" does not then preclude an offeror from proposing or executing any kind of transition plan. *See* AR Tab 10d at 388 (Solicitation Q&A) (stating project "will not have a transition period"). Harkcon's transition plan expressly states it "will provide uninterrupted and efficient support from the very first day of the contract." AR Tab 13b at 629 (Harkcon Technical and Management Information) ("When the contract commences, Team Harkcon will implement a series of meticulously planned processes to ensure a seamless transition and immediate operational readiness."). Harkcon confirmed at oral argument its transition plan proposes "performing on all aspects of the contract from day one." Tr. at 57:15–19 ("THE COURT: [D]oes Harkcon intend to be performing on all aspects of the contract from day one? [HARKCON]: Yes."). Nothing in any phase of Harkcon's transition plan contemplated performing at the same time as AMSG or delaying contract performance after contract start. *See generally* AR Tab 13b at 628–29 (Harkcon Technical and Management Information); Tr. at 60:16–24 ("[THE GOVERNMENT]: . . . [t]he [g]overnment's position is generally transition period is . . . either where both contractors are performing or where it's sort of like a ramp-up period . . . . That's not what's going on here.").

The Agency rationally understood Harkcon's transition plan to mean it would, "[w]hen the contract commences . . . implement a series of meticulously planned processes to ensure a *seamless transition* and *immediate* operational readiness." AR Tab 13b at 629 (Harkcon Technical and Management Information) (emphasis added); *see also* Tr. at 59:18–21 ("[THE GOVERNMENT: Harkcon will] be performing on day one but at the same time we're performing, we're going to be doing these transition activities such as rebadging."). Plaintiff argues Harkcon's statement in phase 4 of its transition to occur after the contract starts—"[o]nce all previous phases are successfully implemented, contract maintenance begins"—demonstrates

Harkcon will not be performing immediately upon the contract start date.  *See* Pl.'s MJAR at 27 (quoting AR Tab 13b at 629 (Harkcon Technical and Management Information)) (emphasis omitted).  Harkcon's proposal says precisely the opposite when it states Harkcon "will provide uninterrupted and efficient support from the very first day of the contract, ensuring continued OST mission success."  AR Tab 13b at 629 (Harkcon Technical and Management Information). Plaintiff offers no reason why Harkcon could not begin contract performance from day one and does not point to anything in the solicitation which precludes Harkcon from detailing its plans to transition the contract.  Accordingly, plaintiff has failed to show Harkcon's transition plan "fails to conform to the material terms and conditions of the solicitation."  *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448–49 (Fed. Cir. 1996) (upholding contract award where protestor did not show the government "acted arbitrarily and capriciously in awarding the contract on the basis of its belief [the awardee's] proposal included a [required item]").

## VIII.    Whether Harkcon's Quotation Violated the Terms of the Solicitation by Not Naming an Alternate Program Manager

Plaintiff argues Harkcon "took exception" to and deviated from the PWS requirement which says: "[t]he name of [the Program Manager] and an alternate who shall act for the Contractor when the manager is absent shall be designated in writing to the CO [Contracting Officer]."  Pl.'s MJAR at 23 (quoting AR Tab 10a at 331 (PWS)) (emphasis omitted).  Plaintiff claims Harkcon rejected this requirement when its quotation specified its program manager would be the "singular touch point for all facets of work performed on the contract."  *Id.* (quoting AR Tab 13b at 613 (Harkcon Technical and Management Information)) (emphasis omitted).  The government argues, and Harkcon agrees, the "Solicitation does not require an alternate Program Manager be identified in the quotation."  Gov't's Cross-MJAR at 23.  The solicitation provided "[t]he contractor shall provide a Program Manager who shall be responsible for the performance of the work.  The name of this person and an alternate who shall act for the Contractor when the manager is absent shall be designated in writing to the CO."  AR Tab 10a at 331 (PWS).  The requirement to specifically identify an alternate program manager only comes after the contract has been awarded and before performance begins.  AR Tab 10a at 331 (PWS) ("The name of [the program manager] and an alternate who shall act for the Contractor when the manager is absent shall be designated in writing to the [contracting officer]."); *see also* Tr. at 69:5–10 ("THE COURT: What about Performance Work Statement Part 1.5.12?  [THE GOVERNMENT]: Your Honor, that refers to once the contract commences.").  At oral argument, plaintiff agreed the RFQ did not require Harkcon to identify an alternate program manager in its initial quotation.  *See* Tr. at 70:7–12 ("THE COURT:  But is there something that, as [the Government] describes, does not allow the naming of an alternate after the contract commences?  [PLAINTIFF]:  Well, I think our argument, Your Honor, is that . . . there's nothing that prohibits that.").

Harkcon's proposal stated "Harkcon's Program Manager (PM), backed by Harkcon's dedicated DOE/NNSA Program Management Office (PMO), will be the singular touch point for all facets of work performed on the contract regardless of the Team Harkcon member/entity performing the work."  AR Tab 13b at 613 (Harkcon Technical and Management Information).

A plain, rational reading of Harkcon's proposal indicates Harkcon's program manager will be joined by at least Harkcon's "DOE/NNSA Program Management Office." *Id.* Harkcon confirmed at oral argument it did not foreclose naming an alternate program manager. *See* Tr. at 67:13–20 ("THE COURT: Did your quotation reject or foreclose the possibility of naming an alternate [program manager]? [HARKCON]: We did not foreclose that. . . . Harkcon was ready, willing and able to do that as soon as the award was made, performance commenced, et cetera, et cetera."). The government confirmed "[t]here's nothing in Harkcon's bid from the agency's perspective that would lead the agency to believe that Harkcon was not going to comply with the PWS upon contract award and once they started the contract to provide an alternative program manager." Tr. at 69:14–19. Moreover, the solicitation states "[t]he Program manager or alternate shall have full authority to act for the Contractor on all contract matters" and the alternate program manager "shall act for the Contractor when the manager is absent." AR Tab 10a at 331 (PWS). Under the terms of the solicitation, Harkcon could have its single point of contact with "full authority to act" be either the lead program manager or, if the lead is "absent," the alternate program manager." *See id.* Harkcon's proposal of its program manager as its "single point of contact" does not reject the possibility its program manager could be a different person depending on the situation. *See* AR Tab 13b at 613 (Harkcon Technical and Management Information) ("Harkcon's Program Manager (PM), backed by Harkcon's dedicated DOE/NNSA Program Management Office (PMO), will be the singular touch point for all facets of work performed on the contract."). Accordingly, the Court determines the Agency's award was not arbitrary and capricious because Harkcon's proposal of its program manager as its single point of contact did not violate a requirement to name an alternate. *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 448–49 (Fed. Cir. 1996) (upholding contract award where protestor did not show the government "acted arbitrarily and capriciously in awarding the contract on the basis of its belief [the awardee's] proposal included a [required item]").

## IX.    Whether [XXXXXXX] Lacks the Security Clearance Required to be Program Manager

Plaintiff argues "Harkcon's quotation remains ineligible for award because Mr. [XXX] lacks a DOE L security clearance." Pl.'s MJAR at 22. Specifically, plaintiff asserts Mr. [XXX] "doesn't have a DOE clearance at all" and would have "to go through a process" to obtain one. Tr. at 86:12–15. Further, plaintiff insists it was arbitrary for the Agency to assign Harkcon a strength because Mr. [XXX] "exceeds the security clearance level requirement." Pl.'s MJAR at 22. The solicitation specifies "[t]he Contractor and all employees must at a minimum be able to obtain an 'L' level clearance within a reasonable timeframe." AR Tab 10a at 330 (PWS). It further specifies the "program manager" must be "cleared/certified" with an L clearance "on day one of the contract." *Id.* at 359. Mr. [XXX] currently holds a "top secret" clearance from the Department of Defense. *See* AR Tab 13b at 631 (Harkcon Technical and Management Information) ("With an active Top-Secret clearance and prior Q clearance, [Mr. [XXX]] is equipped to manage high-security projects effectively."). Although he does not currently hold a security clearance from the Department of Energy, he held a "prior Q clearance." *Id.*

Regarding plaintiff's argument Harkcon is ineligible for the award, the plain language of the solicitation requires the program manager to possess a DOE L level security clearance "on

day one of the contract." AR Tab 10d at 359 (PWS). Mr. [XXX] already holds a top secret clearance from the DOD and previously held a DOE Q clearance. *See* AR Tab 13b at 631 (Harkcon Technical and Management Information). Plaintiff agreed at oral argument Mr. [XXX]'s DOD top secret clearance is generally equivalent to a DOE Q clearance, which are both more demanding clearance levels than the DOE L clearance Mr. [XXX] will be required to have on day one of the contract. Tr. at 85:2–4 ("[PLAINTIFF]: I think the general equation is that the [top secret] is comparable to the Q, Your Honor, and the secret is comparable to the L."). Plaintiff offered no reason why Mr. [XXX] would be unable to comply with the clearance requirement and agreed Mr. [XXX] "very well might" be able to quickly obtain a DOE L clearance. Tr. at 83:13–18. The DOE and the DOD have a well-established reciprocity program whereby DOD security clearance holders can quickly obtain an equivalent clearance from the DOE. *See* AR Tab 46a at 2620 ("[DOE] must accept national security eligibility adjudications for clearances at the same or higher level conducted by an authorized adjudicative agency.").[1] The solicitation requires Mr. [XXX] to be ready with a DOE L clearance "on day one of the contract," AR Tab 10d at 359 (PWS), and the DOE's reciprocity program will allow Mr. [XXX] to quickly and easily obtain an "L" clearance. Plaintiff presents no evidence Harkcon is unable or unwilling to comply with the requirement Mr. [XXX] hold a DOE L level security clearance before day one of the contract.

The Agency assigned a strength to Harkcon because Mr. [XXX] "exceeds the security clearance level requirement." AR Tab 30 at 1189 (Basis of Award). As plaintiff agreed at oral argument, a DOE Q clearance is roughly equivalent to a DOD top secret clearance, and the less-demanding DOE L clearance is equivalent to a DOD secret clearance. Tr. at 85:2–4. DOE Order 472.2A also clarifies a DOE Q level clearance "allows access to: . . . Information and material described below for L Access Authorization . . . [and] Information listed under [top secret], [secret], and [confidential] security clearance." AR Tab 46a at 2585 (DOE Order 472.2A, Ex. 1). Mr. [XXX]'s top secret security clearance is therefore equivalent in level to the DOE Q clearance, which is higher than the DOE L clearance he is required to hold. Since Mr. [XXX]'s top secret security clearance with the DOD is a higher level than the DOE L clearance required, the Agency's determination Mr. [XXX] exceeds the security clearance level requirement is neither "implausible" nor "counter to the evidence before the agency." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009). Accordingly, given Mr. [XXX] exceeds the required security clearance level, the Court determines the Agency's assignment of a strength to Harkcon on this basis was not arbitrary and capricious. *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 448–49 (Fed. Cir. 1996) (upholding contract award where protestor did not show the government "acted arbitrarily and capriciously in awarding the contract on the basis of its belief [the awardee's] proposal included a [required item]").

## X.    Whether the Agency's Best Value Determination Was Arbitrary and Capricious

---

[1] The DOE website explains "[i]f you have a current, Top-Secret security clearance, and your investigation was completed within the previous five years, you won't need to have another investigation in order for DOE to grant you an access authorization. . . . Under reciprocity, a final Secret clearance would result in an L access authorization and a final Top-Secret clearance would support the granting of a Q access authorization from DOE." *Department Vetting Policy and Outreach FAQs*, DOE, https://www.energy.gov/ehss/departmental-vetting-policy-and-outreach-faqs?nrg_redirect=374749 (last visited 29 October 2025).

Plaintiff argues the Agency's best value determination was "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law for at least three reasons." Pl.'s MJAR at 30. First, plaintiff argues "the foregoing errors"—referring to its claims Harkcon made misrepresentations to the Agency and failed to conform to certain solicitation requirements—"necessarily render the Agency's conclusion arbitrary [and] capricious . . . because an award decision cannot rest on a materially flawed evaluation." *Id.* Second, plaintiff argues "the [Agency] failed to consider the substantive differences between the Harkcon and AMSG quotations" and "reduced the competition to price." *Id.* at 31. Plaintiff points out "[t]he SSA observed that '[u]ltimately, the decision was made based on a best-value determination with price serving as the decisive factor due to identical ratings for the two Vendors on all non-price factors,'" despite "AMSG [having] received twenty-one strengths compared to Harkcon's fifteen strengths." *Id.* at 31–32 (quoting AR Tab 30 at 1169 (Basis of Award)) (other citations omitted). Third, plaintiff argues "the Agency overemphasized Harkcon's experience and minimized AMSG's experience." *Id.* at 32.

The government responds the Agency "[a]fter reviewing the strengths of each quotation," and finding "AMSG and Harkcon presented 'the same very high probability of successful performance,' . . . turned to price as the decisive factor and found that Harkcon's quotation, which was $1,245,405 lower in price, offered the best value." Gov't's Cross-MJAR at 30 (citing AR Tab 30 at 1169 (Basis of Award)). The government contends "the SSO, in making her award decision, 'examined the relevant data and articulated a rational connection between the facts found and the choice made.'" *Id.* at 30 (citations omitted).

Plaintiff first argues, based on its claims the Agency should have disqualified Harkcon from competition, "the foregoing errors necessarily render the Agency's conclusion . . . arbitrary [and] capricious . . . because an award decision cannot rest on a materially flawed evaluation." Pl.'s MJAR at 30 (citations omitted). Plaintiff's argument depends on the Court finding error with the Agency's evaluation of Harkcon and failure to disqualify Harkcon from competition. *See id.* at 30–31 (arguing the Agency's best value determination was arbitrary and capricious because the Agency should have disqualified Harkcon). Since the Court finds no error with the Agency's evaluation of or its refusal to disqualify Harkcon, the Agency's best value determination accordingly did not err on those grounds. *See supra* Sections VI.A–B, VII-IX; *see infra* Section XI. "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1355 (Fed. Cir. 2004) (citations omitted).

Plaintiff next argues the Agency's selection of Harkcon's proposal as presenting the best value was arbitrary because "the Agency overemphasized Harkcon's experience and minimized AMSG's experience, . . . highlight[ing] Harkcon's experience without any discussion about the substance of that experience or its relevance to this contract." Pl.'s MJAR at 32. In the basis of award document, the Agency highlighted plaintiff's strong performance as the incumbent. For example, the contracting officer highlighted plaintiff's "[program manager] incumbency ensures that they have established relationships with key stakeholders, a comprehensive understanding of the Performance Work Statement (PWS) and proven management capabilities." AR Tab 30 at 1163 (Basis of Award). Further, plaintiff noted at oral argument the Agency's technical

evaluation of plaintiff—which the contracting officer expressly adopted, *see* AR Tab 30 at 1162 (Basis of Award)—highlighted plaintiff's "use of historical knowledge to support OST/HRP specifically in scheduling medical and psychological appointments reflects an in-depth understanding of the unique needs and processes involved." Tr. at 96:5–9; *see* AR Tab 30 at 1172 (Basis of Award) (assigning plaintiff a strength for the quoted language regarding experience). When evaluating Harkcon, the Agency highlighted "Harkcon and its Contractor Teaming Arrangement (CTA) partners have over 30 years of experience working with NNSA." AR Tab 30 at 1165 (Basis of Award). Plaintiff did not dispute "there is some benefit of that level . . . of having some experience with NNSA." Tr. at 95:5–7 ("[PLAINTIFF]: . . . I'm not disputing that there is some benefit of that level . . . of having experience with NNSA."). Even if thirty years of experience contracting with the Agency did not speak for itself, the Agency explained in its technical evaluation Harkcon's "30+ years of working with DOE/NNSA bring in comprehensive understanding of OST's mission. PEC has staff currently collocated and working at OST HQ, TSTS, AOWC, AOCC, and AOEC. Between the three companies, the team collectively possesses current presence at all OST operating locations, familiarity with PWS scope within NNSA/OST, and an understanding of OST mission/operational battle rhythm." AR Tab 30 at 1184 (Basis of Award). The Agency reviewed both plaintiff's and Harkcon's experience in detail, and the Agency's award to Harkcon in view of relevant experience reflected a "rational . . . consideration of relevant factors. *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) Given the arbitrary and capricious standard requires the Court "to sustain an agency action evincing rational . . . consideration of relevant factors," *id.*, and given the Agency demonstrated rational reasoning and consideration of plaintiff's and Harkcon's past experience, the Court determines the Agency's evaluation of plaintiff's and Harkcon's past experience was not arbitrary and capricious.

Plaintiff further argues the Agency's best value determination was arbitrary and capricious because "the SSA failed to consider the substantive differences between the Harkcon and [plaintiff] quotations" and "reduced the competition to price." Pl.'s MJAR at 31. The solicitation stated "[t]he Government intends to award an Order to the Vendor whose quotation represents the best value to the Government based on the Government's evaluation of four (4) factors (in descending order of importance): (1) Technical Narrative/Approach; (2) Staffing Approach; (3) Key Personnel Resume; and, (4) Past Performance." AR Tab 9 at 164 (Solicitation RFQ). It also provided "[t]he non-price factors (Technical Narrative/Approach; Staffing Approach; Key Personnel Resume; and, Past Performance), when combined, are significantly more important than Price." *Id.* Although the solicitation placed importance on price, it explained "the Government will not make an award at a price premium it considers disproportionate to the benefits associated with the evaluated non-price superiority of one vendor over another. To the extent that the vendors' non-price factors are evaluated as close or similar in merit, Price is more likely to be the determining factor." *Id.* at 164–65.

The Agency assigned adjectival evaluation ratings for each non-price factor to both Harkcon and plaintiff's proposals. *See* AR Tab 30 at 1161–62 (Basis of Award). The Agency assigned both Harkcon and plaintiff "exceptional" ratings for factors 1 through 3, and a "pass" rating for factor 4. *Id.* Each was also assigned a number of strengths for particular positive attributes in their proposal: plaintiff was assigned twenty-one strengths and Harkcon was

assigned fifteen. *See* AR Tab 30 at 1171–91 (Agency Technical Evaluations). At oral argument, plaintiff agreed these strengths "are documented in the technical evaluation report." Tr. at 112:24–25. These technical evaluations were attached to the Basis of Award document, and the contracting officer expressly "concur[ed] in and independently adopt[ed]" those evaluations. AR Tab 30 at 1162 (Basis of Award). Ultimately, the Agency determined: "Harkcon's quotation offered the best value to the government, providing the required services at a $1,247,405.00, or 11.9%, lower price than AMSG while ensuring the same very high probability of successful performance. While Harkcon's and AMSG's quotations each had unique attributes under the non-price factors, none of the unique attributes or strengths of AMSG's proposal (individually, or combined) would justify an additional 11.9% price premium." *Id.* at 1169. The Agency contracting officer's statement it performed an "independent review and judgement of the . . . evaluation," *id.*, is entitled to a strong presumption of good faith. *See Am-Pro Protective Agency v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002). The Federal Circuit has also stated adjectival ratings "are not subject to a mathematical calculation." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 909 n.6 (Fed. Cir. 2013). After fulsome technical evaluations which were adopted into the contracting officer's analysis, the Agency was within its discretion to assign an "excellent" rating to each of Harkcon and plaintiff's proposals despite the disparity in the number of strengths assigned to each proposal. *See E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed. Cir. 1996) (noting matters such as technical ratings "involve discretionary determinations of procurement officials that a court will not second guess") (citations omitted). Since the arbitrary and capricious standard is "highly deferential," a reviewing court must "sustain an agency action evincing rational reasoning and consideration of relevant factors." *Adv. Data Concepts*, 216 F.3d at 1058 (citing *Bowman*, 419 U.S. at 285 (1974)). The Agency's long technical evaluations, incorporated into the Basis of Award analysis, show consideration of relevant factors, including the technical strengths of each proposal. *See* AR Tab 30 at 1171–91 (Agency Technical Evaluations).

As this Court has observed, "[t]he process of making a 'best value' decision is not merely an exercise in adding up strengths and weaknesses, but a comprehensive comparative analysis that necessarily is influenced by the procurement official's expertise." *Coastal Int'l Sec., Inc. v. United States*, 93 Fed. Cl. 502, 550–51 (2010) (citing *Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004)). The solicitation is explicit "[t]o the extent vendors' non-price factors are evaluated as close or similar in merit, Price is more likely to be the determining factor." AR Tab 9 at 165 (Solicitation RFQ). Accordingly, the Agency was within its discretion to make its best-value determination "with price serving as the decisive factor due to identical ratings for the two Vendors on all non-price factors." AR Tab 30 at 1169. Given Harkcon's proposal was rated equally to plaintiff's proposal at a cost discount of more than $1.2 million, the Court finds the Agency's best value determination was reasonable and in accordance with the government's "discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder . . . that will provide the agency with the best value." *Banknote*, 365 F.3d at 1355.

Plaintiff compares this case to *Firstline Trasp. Sec. Inc. v. United States*, 100 Fed. Cl. 359, 373 (2011), in which this court held the Source Selection Evaluation Board's ("SSEB") contract award to a lower-cost bidder was arbitrary because the SSEB "failed to conduct a proper best-value analysis." *See* Tr. at 104:17–21. The SSEB acknowledged FirstLine, the higher-cost

bidder, "had the 'better proposal,'" and assigned higher adjectival ratings to its proposal, but awarded the contract to the lower-cost bidder anyway. *Firstline*, 100 Fed. Cl. at 375–76 ("The difference between the ratings assigned to the proposals was one level for Factors 2 through 4 [Redacted] and two levels for Factor 5 [Redacted] all in favor of FirstLine.") (citations omitted). Additionally, "the FirstLine proposal had thirty-three strengths and not a single weakness . . . while [lower-cost bidder]'s proposal had just one strength and one weakness." *Id.* (citations omitted). Ultimately, this court held "the SSEB largely ignored the chasm between the number of strengths assigned to the proposals" and "failed to account for the significant differences between the competing proposals with respect to technical quality." *Id.* at 376–77. The court held "the SSEB's analysis and the subsequent award of the . . . contract to intervenor was arbitrary, capricious, and not in accordance with law." *Id.* at 379 (citations omitted). Here, Harkcon and plaintiff both received identical adjectival ratings. *See* AR Tab 30 at 1161–1162 (Basis of Award). In *FirstLine*, the lower-cost bidder was at a net disadvantage of five levels. *See* 100 Fed. Cl. at 375–76. Further, Harkcon received 15 strengths and plaintiff received twenty-one, a difference of forty percent. *See* AR Tab 30 at 1171–91 (Agency Technical Evaluations). In *FirstLine*, the strength differential was a stunning 330%. *See* 100 Fed. Cl. at 376. The significant gap between the evaluation differentials in *FirstLine* and in this case demonstrates *FirstLine* is inapposite. Here, the relative technical similarity of Harkcon and plaintiff's proposals ensures the Agency's selection decision falls within the "great deal of discretion in making contract award decisions, particularly when . . . the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." *See Banknote*, 365 F.3d at 1355. The Court will therefore not second guess the Agency's best value determination. *Impresa*, 238 F.3d at 1332–33.

## XI.      Whether Harkcon May Compete for the Contract as a TEPS III BPA Holder

### A.      What the Solicitation Requires Regarding BPA Holders

Plaintiff next argues "Harkcon is not eligible to compete in this procurement, . . . because[] Harkcon does not hold a TEPS III BPA." Pl.'s MJAR at 33. The solicitation states "[t]he Government intends to award a Task Order to the prospective Enterprise-Wide Technical, Engineering, and Programmatic Support Services III Blanket Purchase Agreement [('TEPS III BPA')] Schedule holder whose quote represents the best value." AR Tab 10c at 378 (Solicitation Instructions). The TEPS III BPA ordering guide defines "BPA Holder" as "the CTA Leader or Prime Contractor (if a CTA is not contemplated)." AR Tab 51a at 2806 (TEPS III BPA Ordering Guide). Plaintiff argues the solicitation limits offerors to "BPA Holders," and Harkcon is only a member of a CTA, not a CTA Leader, so Harkcon cannot compete for the contract. Pl.'s MJAR at 34.

A BPA is "an ordering vehicle which makes . . . issuance of orders a more simple process." Tr. at 114:10–12. A BPA functions as "an agreement between the [g]overnment and a contractor to allow repetitive orders during a specified time period." Tr. at 114:13–16. BPAs are not contracts; rather, they are "appropriately characterized as frameworks for future contracts—'a set of ground rules as it were, and no obligations are assumed by either party until orders are given by the [g]overnment and accepted by the contractor.'" *Crewzers Fire Crew*

*Transp., Inc. v. United States*, 741 F.3d 1380, 1381 (Fed. Cir. 2014) (quoting *Modern Sys. Tech. Corp. v. United States*, 979 F.2d 200, 204 (Fed. Cir. 1992)); *see also Zhengxing v. United States*, 204 Fed. App'x 885, 886–87 (Fed. Cir. 2006) ("The BPA at issue, however, is merely a framework for future contracts and only creates a contractual obligation with regard to accepted orders."). BPAs establish particular, knowable terms between contractors in the government, such as "invoicing, discounts, requirements (*e.g.*, estimated quantities, work to be performed), delivery locations, and time," FAR 8.405-3(a)(4), to be used as a preexisting framework for future contracts, *see Crewzers*, 41 F.3d at 1381. In this way, BPAs act as "a funnel to narrow down the type of contractors" so the government can easily negotiate and place orders. Tr. at 132:6–9.

A Contractor Team Arrangement ("CTA") is a related agreement "in which two or more GSA Schedule contractors work together to meet ordering activity needs." AR Tab 51a at 2806 (TEPS III BPA Ordering Guide). A CTA is made up of a "CTA Leader" and "CTA Members." *Id.* "CTA Leaders have been awarded BPAs and have privity of contract with the federal government." *Id.* at 2808. "Each CTA Leader has their own BPA Award number, and each CTA Team Member will sign an agreement with the Team Leader." *Id.* "The [g]overnment will have privity of contract with each business within the teams—allowing the government to engage small businesses directly rather than just through the CTA Leader." *Id.* Functionally, a CTA allows all of its team members to utilize a BPA between its leader and the federal government as if all of the team members had a BPA directly with the government. *Id.* ("In a CTA, a Team Member has the ability to enter into an Order with the Government, as a prime contractor, utilizing its own GSA Schedule, labor categories and rates. Under DOE/NNSA's TEPS III BPA, CTA Leaders have been awarded BPAs and have privity of contract with the Government. CTA Members have also signed the agreements and have privity of contract with the Government as well."). Consequently, CTA "Team Members will not be awarded their own BPAs." *Id.* at 2806.

Here, Harkcon is a member of a CTA arrangement led by MELE Associates, which holds a BPA agreement with the federal government. *See* AR Tab 51b at 2826 (MELE Associates' BPA) (listing Harkcon, Inc. as a "Team Member"). Plaintiff insists Harkcon is therefore not a "BPA holder" because "Harkcon is a member of the MELE Associates CTA, and the MELE Associates BPA identifies MELE Associates—not Harkcon—as the BPA Holder." Pl.'s MJAR at 34.

"Interpretation of the solicitation . . . begin[s] with the plain language of the document." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004). The solicitation uses both "BPA *H*older" and "BPA *h*older." *See, e.g.*, AR Tab 10c at 378 (Solicitation Instructions) (emphasis added) ("The government intends to award a Task Order to the prospective [TEPS III BPA] Schedule *holder* whose quote represents the best value") (emphasis added), 381–82 ("Labor rates must be discounted by at least the BPA Holder's minimum discount as stated in its BPA."). As the government noted at oral argument, "the word BPA schedule holder is used three times in [the solicitation] . . . when the solicitation is talking about who it is limited to, it says BPA holder two times, lowercase H." Tr. at 118:19–22. "[L]ater on . . . it notes that labor rates must be discounted at least by the BPA, capital H, Holder's minimum discount as stated in its BPA." Tr. at 118:22–25; *see* AR Tab 9 at 162

(Solicitation RFQ) ("Labor rates must be at least discounted by the BPA Holder's minimum discount"). Plaintiff offers no other explanation for the distinction in capitalization conventions. When interpreting a contract, one must consider it as a whole and interpret it to harmonize and give reasonable meaning to all its parts. *See McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434–35 (Fed. Cir. 1996). Accordingly, the Court finds, to harmonize these capitalization distinctions, the solicitation distinguishes between referring to a BPA *h*older—a business which can take advantage of a BPA like a CTA member—and a BPA *H*older—a BPA team leader which establishes the BPA framework agreement with the federal government.

Affording capitalization conventions significance in this solicitation accords with the purpose of the CTA arrangement. The CTA arrangement here is designed to allow "two or more GSA Schedule contractors [to] work together to meet ordering activity needs." AR Tab 51a at 2806 (TEPS III BPA Ordering Guide). This arrangement "allow[s] the government to engage with small businesses directly." *Id.* at 2808. A solicitation which limits competition to only a CTA Leader—when the point of the arrangement is for all members to be able to compete for contracts under one BPA—would defeat the purpose of the arrangement. *See id.* (CTAs "allow[] the government to engage with small businesses directly"). Tellingly, at oral argument, plaintiff was unable to provide a single reason why the Agency would limit competition for this contract to CTA Leaders. *See* Tr. at 121:18–23 ("THE COURT: [Plaintiff], is there any practical reason why the [solicitation] would be limited to BPA Holders, capital H, instead of simply anyone falling under a BPA? [PLAINTIFF]: Your Honor, I mean, there's certainly no documented reason as to why the agency would have . . . made that limitation."). When interpreting the solicitation, the Court "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." *Banknote*, 365 F.3d at 1353. The most harmonizing understanding of the solicitation is for Harkcon to be able to compete for this contract because a CTA arrangement is designed to "allow[] the government to engage with small businesses directly." AR Tab 51a at 2808 (TEPS III BPA Ordering Guide). The procurement here is set-aside for a "service-disabled veteran-owned small business" ("SDVOSB"). AR Tab 9 at 79–80 (Solicitation RFQ). MELE Associates is not an SDVOSB, but Harkcon is. *See* AR Tab 13b at 608. When Harkcon competes for this contract as part of MELE Associates' BPA, the government gains the opportunity for the small, veteran-owned Harkcon to perform under a BPA where it would not otherwise be individually eligible. *See* Tr. at 124:11–13 ("[THE GOVERNMENT: The whole point of a CTA teaming agreement is so that these smaller businesses can use the bigger business to get these types of contracts."). It would destroy the point of these agreements—to "allow[] the government to engage with small businesses directly", AR Tab 51a at 2808 (TEPS III BPA Ordering Guide)—if the solicitation then limited competition to the large companies like MELE Associates leading BPA agreements. Plaintiff cites no case from any court or agency where a bidder was disqualified because it was a CTA member rather than a CTA leader. The Court finds the solicitation was limited to businesses which are able to compete under a TEPS III BPA, but did not limit competition to only BPA *H*olders or CTA leaders. All parties agree Harkcon is a member of MELE Associates' BPA. *See* Pl.'s MJAR at 34 ("Harkcon is a member of the MELE Associates CTA"); Gov't's Cross-MJAR at 32 ("Harkcon submitted its quotation as a member of a [CTA] relying on MELE Associates' TEPS III BPA"). Accordingly, the Court finds Harkcon was eligible for award as a CTA member under MELE Associates' TEPS III BPA agreement and satisfied the solicitation BPA requirement. *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir.1996)

(upholding contract award where protestor did not show the government "acted arbitrarily and capriciously in awarding the contract on the basis of its belief [the awardee's] proposal included a [required item]").

## B.    What BPA Signatures Were Required of Harkcon

Plaintiff argues, even if Harkcon is a BPA holder, "the TEPS III BPA ordering procedures preclude Harkcon from submitting a quotation, . . . because Harkcon did not sign the BPA award document." Pl.'s MJAR at 33, 35. The TEPS III BPA ordering guide provides "[a]ll Team Members shall sign the BPA award document as a concurrence in order to have privity of contract and allow the placement of Orders directly with" the federal government. AR Tab 51a at 2806 (TEPS III BPA ordering guide). Plaintiff argues Harkcon "can serve as the Order Leader only if it has 'sign[ed] the BPA award document.'" Pl.'s MJAR at 35 (alteration in original). Plaintiff then insists "the only person who signed the BPA standard form 1449" is "[a] MELE Associates representative." *Id.* at 36 (citing AR Tab 51b at 2822) (MELE Associates' BPA). The failure to sign the BPA award document, plaintiff argues, "render[s Harkcon] ineligible to compete under the terms of the BPA." *Id.* at 37. The government points to Harkcon's signed "BPA Agreement Form," a document signed prior to BPA award, and argues that agreement satisfied the requirement to sign the BPA award. Gov't's Cross-MJAR at 34.

First, plaintiff asserts "the BPA required Harkcon to sign the BPA award document to have privity of contract with the Government and . . . Harkcon did not meet that requirement, rendering it ineligible to compete under the terms of the BPA." Pl.'s MJAR at 37; *see also* Tr. at 135:22–25 ("[PLAINTIFF]: [F]or purposes of an order under a BPA, there is no privity . . .unless the prime offeror . . . has attested to and executed the BPA award."). The TEPS III BPA ordering guide provides "[a]ll Team Members shall sign the BPA award document as a concurrence in order to have privity of contract and allow the placement of Orders directly with the federal government." AR Tab 51a at 2806 (TEPS III BPA ordering guide). All parties agreed at oral argument, however, Harkcon already has privity of contract with the federal government through Harkcon's Federal Supply Schedule ("FSS") contract. *See* Tr. at 134:17–20 ("[PLAINTIFF]: ". . . [W]e don't dispute that they have an FSS contract and that creates privity of contract with the Government through the FSS contract generally."); Tr. at 127:20–21 ("[THE GOVERNMENT]: [Harkcon] has privity of contract with the Government through its GSA FSS schedule."); *see also* Tr. at 128:4–7 ([THE GOVERNMENT]: "It does not need to be signed by Harkcon because Harkcon already has privity with the Government through its FSS schedule.") Accordingly, to the extent Harkcon was required to sign the BPA award document to establish privity of contract with the government, Harkcon has already established the requisite privity through its FSS contract.

Second, to the extent Harkcon was required to sign the BPA award document, Harkcon signed a document titled "BPA Agreement Form" prior to the award of MELE Associates' BPA. *See* AR Tab 54a at 2888 (Harkcon BPA Agreement Form). That agreement specifies "the Contractor agrees to the following terms of a BPA EXCLUSIVELY WITH U.S. Department of Energy, National Nuclear Security Administration." *Id.* (emphasis omitted). Every other member of MELE Associates' BPA signed the same document, as did every member of AMSG's BPA. *See generally* AR Tab 54a (MELE Associates' BPA Agreement Forms); AR

Tab 54b (AMSG's BPA Agreement Forms). Aside from a blank "BPA Number" space at the top of the document—marked with an asterisk stating the blank is "to be completed at BPA Award"—the agreement form is complete. *See* AR Tab 54a at 2888 (Harkcon BPA Agreement Form). This signed agreement bound Harkcon to the terms of MELE Associates' BPA. *See id.* Further, the AR shows the AMSG CTA members, including AMSG, have BPA agreement forms which match Harkcon's, including an unfinished blank for the BPA number at the top-left of the agreement. *See generally* AR Tab 54b (AMSG BPA Agreement Forms) (showing all seven BPA agreement forms were signed in May 2022 and lack a BPA number on the assigned blank line). The form plaintiff argues Harkcon must sign, standard form 1449, has only one place for a contractor signature, which is taken up by a representative of MELE Associates, the CTA lead. *See* AR Tab 51b at 2822 (MELE Associates' BPA). When asked where Harkcon—or any of the other members of MELE Associates' BPA for that matter—are meant to sign that document as plaintiff argues, plaintiff could only speculate "there could have been . . . either additional forms that are included, or it could have been this BPA agreement form." Tr. at 133:8–11; *see also* Tr. at 151:16–17 ("[INTERVENOR:] There's only room for one signature."). No additional forms on which Harkcon could sign onto the standard form are in the administrative record, nor does plaintiff point to any place in the administrative record to show such forms exist. Counsel for plaintiff was unsure whether the members of plaintiff's CTA had signed the standard form, and plaintiff's full BPA is not in the record. *See* Tr. at 148:14–20 ("THE COURT: Does [plaintiff] have other CTA members? [PLAINTIFF]: . . . I believe . . . it does, Your Honor. THE COURT: And did they also sign your award? [PLAINTIFF]: . . . I don't know. . . . I don't believe that the full BPA award document [is in the record]."). The administrative record, therefore, does not support plaintiff's argument Harkcon is required to sign the standard form 1449 to establish privity of contract with the government. The remaining option offered by plaintiffs, "the BPA agreement form," Tr. 133:8–11, is exactly what Harkcon signed, *see* AR Tab 54a at 2888 (Harkcon BPA Agreement Form). This is the same document every other member of both MELE Associates' and AMSG's BPA also signed. *See* AR Tab 54a (MELE Associates' BPA Agreement Forms); Tab 54b (AMSG BPA Agreement Forms). Multiple places in the administrative record also demonstrate Harkcon is considered a part of MELE Associates' BPA. *See* AR Tab 51b at 2827 (MELE Associates' BPA) (listing Harkcon, Inc. as a team member); AR Tab 3 at 11 (TEPS III BPA CTA Team Composition Matrix) (listing Harkcon under MELE Associates' BPA). The administrative record therefore contains ample evidence Harkcon satisfied the requirements to become a CTA member under MELE Associates' BPA by signing the BPA agreement form. On the other hand, it lacks evidence to support plaintiff's argument Harkcon was required, in some unknown way, to sign MELE Associates' standard from 1449. Plaintiff is also unable to point the Court to any case from any court or agency where an offeror was disqualified for failing to sign a particular document related to a BPA. *See* Tr. at 138:4–9 ("THE COURT: Can you point the Court to any case where a bidder was disqualified for not signing a particular BPA document? [PLAINTIFF]: We have not seen a particular case specific to a BPA."). The Court finds Harkcon's signature on the BPA Agreement form, AR Tab 54a at 2888, satisfied the requirement that "Team Members shall sign the BPA award document," AR Tab 51a at 2826 (TEPS III BPA Ordering Guide). Harkcon is therefore able to utilize MELE Associates' BPA to compete for this award, and has not "fail[ed] to conform" to the "material terms" that a bidder be a member of a TEPS III BPA. *E.W. Bliss Co.*, 77 F.3d at 448–49 (upholding contract award where protestor did not show the government "acted

- 37 -

arbitrarily and capriciously in awarding the contract on the basis of its belief [the awardee's] proposal included a [required item]").

## XII.    Whether Plaintiff is Entitled to a Permanent Injunction

Lastly plaintiff argues it is entitled to a permanent injunction.  Pl.'s MJAR at 38–39.  "Before granting injunctive relief, [a] trial court 'must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief.'"  *Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1375 (Fed. Cir. 2024) (quoting *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)).  At oral argument, plaintiff agreed if it does "not win on the merits then the Court [does] not have to address any of the [other] permanent injunction factors."  Tr. at 152:12–18 ([PLAINTIFF]:  Yes.  If Your Honor . . . rules against AMSG on every issue, then we would not have succeeded on the merits, which would be a requirement to get injunctive relief.").  According to the first factor, plaintiff is not entitled to injunctive relief because plaintiff does not prevail on the merits, as laid out in the foregoing analyses.  The Court therefore need not evaluate plaintiff's arguments on irreparable harm, the balance of hardships, or the public interest, and must deny plaintiff's request for permanent injunctive relief.  *See Info. Tech. & Apps. Corp. v. United States*, 51 Fed. Cl. 340, 357 n.32 (2001) ("Absent success on the merits, the other factors are irrelevant."), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003).

## XIII.    Conclusion

For the foregoing reasons, the Court **DENIES** plaintiff's Motion for Leave to Conduct Limited Discovery and to Supplement the Administrative Record, ECF No. 22, **GRANTS** the government's Cross-Motion for Judgment on the Administrative Record, ECF No. 28, **GRANTS** intervenor's Cross-Motion for Judgment on the Administrative Record, ECF No. 26, and **DENIES** plaintiff's Motion for Judgment on the Administrative Record, ECF No. 23.  The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge